## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| NATALIE JAMES, individually, and on behalf of all others similarly situated, and<br>JEROME DAY, individually, and on behalf of all others similarly situated,<br>CARL AUSTIN, individually, and on behalf of all others similarly situated,<br><br>            *Plaintiffs*,<br>    v.<br><br>DETROIT PROPERTY EXCHANGE, a Michigan Corporation, SUENA HOMES REALTY LLC, a Michigan Limited Liability Company, HOMES OF DETROIT, LLC, a Michigan Limited Liability Company, CRYSTIAN SEGURA, an individual and MICHAEL KELLY, an individual, jointly and severally,<br><br>            *Defendants*. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) )<br><br>Hon.<br><br>Civil Action No. 18-cv-13601<br><br>**JURY TRIAL DEMANDED**<br><br>**CLASS ACTION COMPLAINT** |

## <span style="color:red">RECORDS PRESERVATION NOTICE</span>

**<span style="color:red">You are hereby notified to preserve during the pendency of this action all records and documents in all forms and formats (digital, electronic, film, magnetic, optical, print, etc.) that are relevant or may lead to relevant information, and to notify your employees, agents and contractors that they are required to take appropriate action to do the same.</span>**

## CLASS ACTION COMPLAINT

Plaintiffs Carl Austin, Jerome Day, and Natalie James bring this class action complaint, on behalf of themselves and all others similarly situated, against Defendants Detroit Property Exchange ("DPE"), Suena Homes Realty LLC ("Suena Homes"), Homes of Detroit, LLC, Crystian Segura ("Defendant Segura"), and Michael G. Kelly ("Defendant Kelly") (collectively "Defendants").

## <u>NATURE OF ACTION</u>

1.      This action arises out of Defendants' abusive, predatory land contract scheme in Detroit wherein Defendants (1) attract potential purchasers with the possibility of home ownership, (2) have the purchasers sign ambiguous, opaque contracts with high interest rates that attempt to get around Truth in Lending Act and Homeownership Equity Protection Act provisions, (3) provide the purchasers every indication before and after signing documents that the purchasers are buying a home to encourage them to keep paying the monthly payments and to repair the dilapidated properties, (4) later *evict the purchasers as tenants* (rather than land contract vendees) based on Defendants' intentional use of ambiguous, confusing, and cherry-picked language when the purchaser almost inevitably gets behind on payments due to their general lack of an ability to pay back the loans, and (5) then restart the process with  a new, unsuspecting purchaser. Defendants' scheme is all the more insidious because they extend these land contracts to persons whom they know or should know are highly likely to default on the terms of the agreement. By engaging

in the above conduct, Defendants have violated the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq*., and the Home Ownership Equity Protection Act ("HOEPA"), 15 U.S.C. 1639, *et seq*.

2.     Defendants' seller-financed land contracts are residential mortgage transactions within the meaning of 15 U.S.C. § 1602(x), 12 C.F.R. § 1026.32(a)(1), and many are also "high-cost mortgages" within the meaning of 15 U.S.C. § 1602(bb).  As such, TILA and HOEPA provisions govern Defendants' conduct and these transactions.

3.     Generally, and as set forth in more detail within this Complaint, certain Defendants have violated section 1639(b) by creating, negotiating, and extending seller-financing to purchasers that have predatory characteristics and steering the consumers toward these predatory loans without considering the purchasers' reasonable ability to repay the loan.

4.     Generally, and as set forth in more detail within this Complaint, certain Defendants have violated section 1639(c) of TILA by failing to meaningfully collect and analyze consumer financial data to make a reasonable, good faith determination that purchasers could repay the loans.

5.     Further, as set forth in more detail within this Complaint, Defendants have extended "high-cost mortgages" to Plaintiffs and the Class without complying with the HOEPA. High-cost mortgages involve any consumer credit transaction that

3

is secured by the consumer's principal dwelling in which there is a first mortgage and the Annual Percentage Rate ("APR") is more than 6.5 percentage points higher than the average prime offer rate.

6.      Specifically, Defendants have violated section 1639 of the HOEPA by, *inter alia*, failing to provide mandatory disclosures to Plaintiffs and the Class as required by section 1639(a) and(b), failing to determine the Plaintiffs' and the Class's ability to repay the high-cost loans as required by section 1639(h), and failing to ensure that Plaintiffs and the Class obtain pre-loan counseling as required by section 1639(u).

## JURISDICTION AND VENUE

7.      Jurisdiction is conferred on this Court over the subject matter of this Complaint by 42 U.S.C. § 3613(a), 15 U.S.C. § 1640(e), and 28 U.S.C. §§ 1331 and 1367.

8.      Defendants have violated the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*, and the Home Ownership Equity Protection Act, 15 U.S.C. 1639, *et seq*.

9.      Defendants DPE, Homes of Detroit, LLC and Suena Homes are "creditors" as defined in 15 U.S.C. § 1602(g).

10.     The Plaintiffs and each Defendant are separately a "person" as that term is defined in 15 U.S.C. § 1602(e).

4

11.     Defendants DPE, Homes of Detroit, LLC, and Suena Homes extended "credit" to Plaintiffs as that term is defined in 15 U.S.C. § 1602(f).

12.     The Defendants engaged in a "credit sale" with Plaintiffs as that term is used in 15 U.S.C. § 1602(h).

13.     The Plaintiffs are "consumers" as that term is defined in 15 U.S.C. § 1602(i).

14.     The Plaintiffs and Defendants engaged in "consumer credit," "residential mortgage," and "high-cost mortgage" transactions as those terms are defined in 15 U.S.C. § 1602(i), 15 U.S.C. § 1602(x) and 15 U.S.C. § 1602(bb).

15.     The real estate that is the subject of this Complaint is located within Detroit, Wayne County, Michigan and is a "dwelling" as that term is defined in 15 U.S.C. § 1602(w).

16.     Crystian Segura, DPE, Homes of Detroit, LLC, and Suena Homes are "mortgage originators" as the term is defined in 15 U.S.C. § 1602(dd)(2).

17.     The alleged violations occurred and substantially all the events, transactions, and occurrences relevant to this lawsuit arose within the geographical boundaries of Detroit, Michigan. Therefore, venue is proper in this Court.

## **THE PARTIES**

18.     Plaintiffs are residents of Detroit, Michigan.

5

19.     DPE regularly engages in the business of land contract lending and does substantial land contract business in Detroit, Michigan. DPE is a Michigan corporation in good standing with its principal place of business located at 51 W. Hancock Street, Detroit, MI 48201.

20.     Suena Homes regularly engages in the business of land contract lending and does substantial land contract business in Detroit, Michigan. Suena Homes is a Michigan limited liability company in good standing with its principal place of business located at 51 W. Hancock Street, Detroit, Michigan, 48201.

21.     Homes of Detroit, LLC regularly engages in the business of land contract lending and does substantial land contract business in Detroit, Michigan. Homes of Detroit, LLC is a limited liability company in good standing with its principal place of business located at 51 W. Hancock, Detroit, MI, 48201.

22.     Crystian Segura is a licensed real estate agent in the State of Michigan, license number 6501384416.

23.     Upon information and belief, Crystian Segura resides in Shelby Township, Michigan.

24.     Upon information and belief, Michael Kelly owns and operates DPE, Homes of Detroit, LLC, and Suena Homes which operate and transact business in Detroit, Michigan.

25.     Michael Kelly is a licensed real estate broker in the State of Michigan, license number 6502381812.

26.     Upon information and belief, Michael Kelly operates a land contract scheme through a series of entities that he directs and controls, including, without limitation, Suena Homes, DPE, Homes of Detroit, LLC, and Dream Realty Co.  (See, Ex. 1, List of Kelly owned entities).

27.     Upon information and belief, Michael Kelly is a resident of Grosse Pointe Woods, Michigan.

## FACTUAL BACKGROUND

### I.  Land Contract – the Instrument

28.     A land contract, sometimes referred to as a contract for deed, is a method of seller financing utilized to purchase real property. In these contracts, while the buyer becomes obligated to pay a certain purchase price at a certain interest rate over a term of years (often 20 or 30 years), he or she does not obtain the deed to the property until the full purchase price has been paid. Immediately upon signing the contract, the buyer takes on the obligation to pay the property taxes, obtain homeowner's insurance, and make any needed repairs to the property – all without holding legal title to the home. If the buyer defaults during the term of years, the contract usually purports to allow the seller to cancel (or "forfeit") the land contract, keep all payments made by the buyer, and evict the buyer through a forfeiture

proceeding which has less protections and due process than judicial foreclosure, and more protections and due process than a summary proceeding to evict a tenant.

29.     Land contracts are residential mortgage transactions that are subject to TILA, HOEPA, and various regulations. *See e.g.,* 15 U.S.C. § 1602(x) ("The term 'residential mortgage transaction' means a transaction in which a mortgage, deed of trust, purchase money security interest arising under an installment sales contract, or equivalent consensual security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling"); *see also,* 12 C.F.R. 1026.32(a)(1)(stating that a high-cost mortgage is "any consumer credit transaction that is secured by the consumer's principal residence…" that meets certain criteria such as having an APR that exceeds the average prime offer rate by 6.5 percentage points for a first-lien transaction).

30.     Land contracts in the context of this case are "consumer credit transactions" within the meaning of 15 U.S.C. §1602(i) because they are "one[s] in which the party to whom credit is ... extended is a natural person, and the ... subject of the transaction [is] primarily for personal ... purposes." *Robertson v. U.S. Bank, N.A.*, 831 F.3d 757, 763 (6th Cir. 2016).

31.     Land contracts are as old as racially disparate access to mortgage credit and have been used by sellers as a mechanism to sell their properties to purchasers who, for one reason or another, cannot obtain conventional financing. For example,

in the 1930s to the 1960s, when federal homeownership programs prevented most African-American borrowers from accessing a traditional mortgage loan, land contracts were marketed in credit-starved communities of color as a means of attaining homeownership. In tightly segregated urban neighborhoods, land contracts were often the primary way to purchase a home. One leading advocate estimated that in Chicago during the 1950's, 85% of the properties purchased by African-Americans were sold through land contracts. Beryl Satter, *Family Properties: Race, Real Estate, and the Exploitation of Black Urban America* (Metropolitan Books, 2009), 4.

32.     When access to mortgage lending expanded in the 1970s through the subprime boom of the 1990s and early 2000s, land contracts became less prevalent.

33.     With the constriction in mortgage lending that followed the subprime foreclosure crisis, land contracts are experiencing a resurgence. Defendants have been buying up foreclosed, usually dilapidated, houses at bargain prices and selling them on land contract to buyers who are eager to pursue the American dream.

## II.  THE SCHEME

### *Step 1: Acquire Cheap, Dilapidated Properties*

34.     Defendants lure potential purchasers in with hopes of attaining the American dream and attempt to perform a real estate bait-and-switch within the effectuating documentation. Defendants take as much money from Plaintiffs and the

Class up front and within a short period of time as possible, and then, once they fall behind, evict them as tenants—even though Plaintiffs and the Class are (and have been continuously told and led to believe they are) purchasing the properties.

35.     To keep initial costs low, Defendants purchase countless properties from Wayne County tax foreclosures, as well as other avenues, at rock bottom prices. While the properties are believed to be purchased mostly sight-unseen, Defendants are aware—based on the price, location, and previous experience with real estate in the area—that these homes are dilapidated, and largely uninhabitable.

36.     The 2008 Recession granted Defendants an opportunity to buy houses at rock bottom prices – $10,000 or even less. Defendants seized this opportunity and, today, it is believed that the land contract schemes are around 85-90% of their business.  (Ex. 2, Land contracts Trip up Would-be Homeowners. *The Detroit News*. February 29, 2016, p. 2).

37.     The houses are in terrible condition and contain latent defects. Defendants make no repairs before selling them. The following problems, among others, are common: (a) fundamental components such as water heaters, furnaces, electrical wiring, plumbing fixtures, and gas lines are often missing or badly damaged; (b) basements flood and roofs leak; (c) windows and doors are missing or broken; (d) exterior and interior walls have holes; (e) there are rodent, cockroach, and/or termite infestations; (f) floors have holes and are damaged by animal feces

and urine; and (g) there is extensive mold because of the leaks.  (See, for example, Ex. 2; Ex. 3, Natalie James and Jerome Day quotes for repairs, and inspector sheet).

38.    Many of the most serious problems are latent defects and cannot be discerned by prospective purchasers. Water issues involving the roof are generally hidden, unless it is a rainy day when few people are looking at houses. Electrical, water, and gas issues may not be immediately discernable because utilities are usually turned off.

39.    Defendants, on the other hand, are fully aware of the poor condition of their houses. After acquisition by Defendants, many of the houses are vacant for an extended time and often deteriorate even further due to vandalism and theft. Defendants also receive many complaints about the condition of the houses from consumers.  Defendants are aware of these complaints when they go to resell the house to a new victim after the previous tenant is evicted.

40.    Defendants do not disclose what they paid for the house and do not provide an independent appraisal to purchasers (nor do Defendants encourage purchasers to obtain an appraisal).  As with inspections, Defendants know that their customers are unlikely to obtain an appraisal on their own because they lack the necessary experience and financial resources. Defendants count on customers not knowing the true condition or value of their houses before they sign a contract.

*Step 2: Market the Properties as For Sale Via Land Contract*

41.     Based on the condition and location of the houses, Defendants know that appreciation alone is unlikely to provide a profit, so they must either sell the properties or rent them out. If they rent out the properties they can receive a steady stream of cash month after month and utilize summary proceedings to evict a non-paying tenant. However, Defendants know that few—if any—renters will agree to pay the monthly rent Defendants seek where the properties are dilapidated and where the renter will be responsible for all the upkeep, as well as taxes and utilities. There is no upside for the tenant in such a transaction.

42.     Further, as Defendants are no doubt aware, Michigan law prevents a landlord from collecting a security deposit that is greater than 1.5x the monthly rent. This limits Defendants' ability to get as much cash up front as possible.

43.     So, Defendants had to conceive of a way to convince a consumer that paying a monthly payment, as well as taking on all the expenses and risk of living in a home, is a worthwhile investment. Defendants turned to land contracts. By marketing the transaction as purchasing a home on land contract, Defendants could take advantage of a low-income person's desire to both (1) have stable housing, and (2) finally own their own home. Defendants know that a person is more willing to invest their time and hard-earned money when she believes that it will be her property in the end.

44. Further, under a land contract, Defendants could collect an amount greater than 1.5x the monthly payment and call it a "non-refundable down payment."

45. However, removal of a vendee through summary proceedings (when forfeiture is permitted by the contract) takes more time (providing for a 90- or 180-day redemption or vacate deadline) and is costlier than summary proceedings against a tenant (which provides for a 10-day redemption or vacate period from the date of judgment). Defendants wanted to take advantage of these features.

46. To lure in customers, Defendants advertised the properties, both online and in print ads, as land contract purchases. When the potential purchaser came in to inquire, Defendants would tell them that very few documents were needed to qualify—State ID, a social security card, and maybe some pay stubs. Sometimes Defendants may require bank statements and tax documents. Yet, at the same time, Defendants tell potential buyers that a "summer special" is available to get a home on land contract with only the State ID, a social security card and some pay stubs. Regardless, it does not appear that Defendants meaningfully analyze the data.

47. All along, Defendants insist that the potential purchaser is buying the property and that, if the purchaser falls behind, Defendants will work with him/her.

### *Step 3: Have the Purchaser Sign Intentionally Confusing, Ambiguous Documents*

48.     Then, when it comes time to sign paperwork, Defendants present these low-income purchasers with numerous documents, run through them quickly, and insist that the purchaser is buying the property.

49.     The documents that Defendants provide are titled "Lease with Option" and "Real Estate Purchase Agreement." They are executed together, and at the same time, in addition to other documents such as a seller's lead disclosure form.

50.     The "Lease with Option" document, which may have a different title depending on the customer, has terms that are couched in usual landlord/tenant language, referring to the customer as a tenant, stating the lease payments and the term of payment, among other terms. It also provides the terms to exercise the purported option to purchase the property.

51.     In contrast, "the Real Estate Purchase Agreement", which may have varying titles, as well, explicitly states that the customer is purchasing the property and provides the terms of payments: principal, interest rate, and the term of years, among other terms.

52.     Together, the documents are ambiguous and confusing. One purports to make the customer a tenant; the other, a purchaser.

53.     Defendants capitalize on this intentionally created confusion to convince customers to pay high down payments, make repairs on dilapidated

14

properties (Defendants are quick to point out that because customers are purchasing the property, Defendants will not help with repairs or habitation issues), and get customers to become invested in the process.

54.    But, when it suits Defendants, they will cite the "lease language" contained within the documents and have the customers evicted as tenants, rather than the appropriate proceedings for land contract vendees, a deception made relatively easy by the customers' humble income and inability to obtain counsel.

### _Step 4: After the Purchaser Falls Behind, Defendants Utilize the Ambiguous Language of the Contract to Evict the Purchaser as a Tenant Rather than a Land Contract Vendee_

55.    This is the bait and switch. Defendants tell a purchaser that he is buying the property and insist that Defendants will work with him if he falls behind on the payments. Then, while continuing to make these representations, Defendants have the purchaser sign paperwork that purports to make the purchaser both a tenant and a purchaser at the same time. Defendants then take advantage of the ambiguous documentation and provisions that purport to make the purchaser a tenant when the purchaser—almost inevitably—falls behind on the payments.

56.    However, until the Defendants are ready to remove the Plaintiffs and Class members, Defendants present every indication that Plaintiffs are purchasing the property. They do this because they know that the crux of the transaction is that

the customer is seeking to buy the property and that, in exchange for monthly payments, the customers expect to receive title at the end of the term.

57.    For example, in the case of Natalie James and Jerome Day, DPE sent an invoice that provided the month's payment (broken down into interest and principal), as well as referring to a loan number (HD3469Thr-RC), the collateral (i.e., the property), and the maturity date (11/15/23). (See, Ex. 4, Natalie James and Jerome Day Invoices).

58.    These documents were sent even *after* Natalie James and Jerome Day were behind on submitting payments.

59.    Natalie James and Jerome Day were even presented with a document entitled "Land Contract Addendum" that was based on no more than the documents they had signed previously—the "Real Estate Purchase Agreement" and the "Lease with Option." (See, Ex. 5, Natalie James and Jerome Day Land Contract Addendum).

60.    Defendants provided Plaintiff Carl Austin with almost identical invoices.

61.    For example, Plaintiff Austin received an invoice from DPE that was printed on 02/09/18 and was due on March 1, 2018 for $1,867. (See, Ex. 6, Carl Austin DPE Invoice).

62.    The invoice listed a "loan number: SH8115Str-RC" and it listed the "Collateral" for the loan as "8115 Strathmoor (NO. . .)", with a maturity date of "03/01/24."

63.    In addition, the invoice shows that each monthly payment is a combination of principal, interest, tax/insurance escrow, and late/service fees. For principal the invoice stated "Principal (Balance 19,419.99)" and listed a "YTD (net)" of 186.61. For interest, it stated "Interest (10.000%)" with a "YTD (net) of $163.39. It listed: "Tax/Insurance escrow" with a "YTD (net) of $150.00."

64.    The invoice refers to "PITI" which commonly stands for "Principal, Interest, Taxes, and Insurance" within the real estate finance context.

65.    Finally, the invoice even states in small print that "financial counseling is available at 800-569-4287 or HUD.gov, Resources, HUD Approved Housing Counseling Agencies."

66.    These representations are consistent with Defendant Kelly's own statements to Natalie and Jerome. During a meeting, Defendant Kelly insisted that Natalie and Jerome own the property they ae purchasing. He said that each payment was for principal and interest, just like in a mortgage payment, and that the Real Estate Purchase Agreement was an exercise of the option referred to in the Lease with Option document. He further told Natalie and Jerome that these documents

were enough to show that they were the owners of the property because Michigan recognizes equitable title under such contracts.

67.    Defendant Kelly's statement is consistent with the intent of the documents that Plaintiffs and Class members sign and is consistent with the representations that are made to them orally and within various documents they are sent. Yet, Defendants *still* attempt to evict Plaintiffs and the Class as tenants, rather than as vendees under a land contract.

68.    In sum, and as set forth in more detail below and throughout this Complaint, although the documents signed by the Plaintiffs and the Class do not contain the words "land contract," Defendants treat the Plaintiffs and the Class as purchasers, and provide the Plaintiffs with documentation to support that conclusion, in addition to continually insisting that the Plaintiffs and Class members are purchasing the properties.

69.    Until Defendants attempt to evict the Plaintiffs or the Class members, they are told they are purchasers, not renters. But, once Defendants feel that the purchasers have fallen too far behind, Defendants suddenly evict the purchasers as tenants.

70.    In other words, Defendants sold Plaintiffs and the Class members home ownership but evicted them as tenants.

71.     Perhaps the most insidious part of the scheme is that Defendants knew—based on income and previous experience—that the purchasers would inevitably fall behind on the payments. Defendants do not conduct a good faith, reasonable evaluation of the purchaser's ability to pay the monthly payments on the land contract, nor do Defendants take into account the costs of repairs, utilities, and other costs associated with home ownership.

72.     The scheme has resulted in defaults and delinquencies within a relatively short time after consummating the transaction and it has also historically resulted in high levels of delinquencies and defaults. This is evidenced by the fact that DPE has a ratio of 1.49 "evictions" for each property in its portfolio. (Ex. 7, Ackers, J & Seymour, E., *Instrumental Exploitation: Predatory Property Relations at City's End*, Elsevier Ltd, Feb, 20, 2018). There is no sign of abatement and DPE is but one entity owned and controlled by Defendant Mike Kelly.

73.     This high level of delinquency and default demonstrates that Defendants know that the demographic and clients they target and consummate transactions with cannot afford the abusive, predatory terms they have placed in these contracts.

74.     But, Defendants do not care because the constant turnover allows them to increase profits. While it is true that the constant default and turnover means Defendants will accrue some costs related to "evicting" the purchasers, they will

more than make up for these costs by convincing another purchaser to pay a "non-refundable down payment" and collecting payments from that purchaser on the same terms. Therefore, this constant cycle of purchase and removal allows Defendants to keep the properties and maintain a continuous stream of cash flow.

### III. Data Establishes the High Default Rate of Defendants' Scheme

75.     Predatory land contracts in Detroit have increasingly threatened the housing landscape in Detroit, and its surrounding areas. A study by Professor Joshua Ackers, Ph.D. and Eric Seymour, Ph.D. (the "Study"), *supra*, found that "In areas where people have limited access to credit and low incomes, the land contract is a common instrument to finance home sales. For buyers, the land contract represents an opportunity to own their homes. For unscrupulous agents, it is an opportunity to profit through exploitation and eviction. The speculative use of land contracts generates a cycle of dispossession as contracts fail and another buyer is found only for the subsequent buyer to fail again." (Ex. 7).

76.     The Study further found that, "Our sample of the recorded contracts filed with Wayne County Register of Deeds found down payments that exceed the owner's original purchase price, high interest rates, escalator clauses, and requirements that disputes be handled through arbitration rather than the courts." *Id.* at 131.

20

77.     The Study concluded, "*This research provides direct evidence of the link between foreclosure buyers, land contracts, and evictions*. *Id*. at 137. [Emphasis added].

78.     In Table 6, the Study shows that Defendant DPE was one of the largest known contract sellers and that *Detroit Property Exchange initiated more eviction orders than properties it owned with a ratio of 1.49 cases for each property in DPE's portfolio*.

79.     The Study explained, "We linked records of landlord-tenant actions to properties in contract sellers' portfolios if the date those actions were initiated later than the date contract sellers purchased those properties. In the results shown in Table 6, we found that the 7430 properties acquired by known contract sellers in recent years, 2273 of them linked to at least one subsequent landlord-tenant action. There are 4428 total subsequent landlord-tenant actions recorded for those properties, affecting 7122 named defendants. *Detroit Property Exchange initiated more orders than properties, thus the ratio of 1.49 cases for each property in their inventory*." *Id*. at 137. [Emphasis added].

80.     The Study states, "*Though the relationship between land contracts and evictions for Detroit Property Exchange is the most extreme with 1.49 evictions per property, the predatory activity of this company and its many shells has persisted unabated in the city for decades*." "Kelly and his company generally purchase

21

properties out of tax foreclosure and market to buyers on Facebook, door-to-door, and word of mouth." *Id*. at 137. [Emphasis added].

81.    The Study also found that Defendant Michael Kelly is among the top property speculators in Detroit. *Id*. at 134.

### IV.  Defendants' Predatory Activity Is Well-Known

82.    Much has been written over the years about Defendants' predatory scheme in Detroit.  In 2016, *The Detroit News* reported that Defendant DPE buys and sells about 600 tax foreclosed homes in Detroit each year and 99.9% are financed with land contracts.  (Ex. 2).

83.    *The Detroit News* also reported that, "'Land contracts don't cause as many problems there [referring to Oakland and Macomb counties] as ones in Detroit, which often involve ramshackle homes purchased from tax foreclosure auctions and contracts that are written to fail,' contended Joon Sung, deputy chief counsel of Michigan Legal Aid and Defender Association, a nonprofit that represents the needy in court."

84.    In 2014*, The Detroit News* reported that: "The largest private property owner, a Grosse Pointe Woods resident named Michael G. Kelly, had used tax auctions to build a portfolio of more than 1,152 parcels on which nearly $100,000 in blight fines were owed going back six years, the investigation found."  (Ex. 8, <u>Bill in Michigan House Targets Property Speculators</u>. *The Detroit News*. Dec. 4, 2014).

## V.  Plaintiffs' Transactions with Defendants

### *Plaintiff Carl Austin*

85.      Plaintiff Carl Austin ("Plaintiff Austin") purchased a house from Defendants, which is located at 8115 Strathmoor, in Detroit, Michigan, 48228.

86.    Plaintiff Austin has a relatively low income and resides in Detroit, making it difficult for him to obtain conventional financing to purchase a home; thus, he turned to Defendants for this opportunity for home ownership.

87.    A friend told Plaintiff Austin about Defendants and the opportunity to buy a home on a land contract.  Plaintiff Austin saw signs in which Defendants advertised that they were selling "homes on land contract." Plaintiff Austin also saw multiple signs at Defendants' office that promoted the land contract homes stating, "homes, 500 down, come inside, land contract."

88.    In Summer 2016, Plaintiff met with Defendant Crystian Segura.

89.    Defendant Segura is a real estate agent and property manager for Dream Realty Company.

90.    Upon information and belief, Defendant Kelly owns Dream Realty Company.

91.    Upon information and belief, Defendant Kelly owns DPE.

92.    Upon information and belief, Defendant Segura also works for and is an agent for DPE and Defendant Kelly.

93.     Defendant Segura told Plaintiff Austin that Defendants were running a "summer special" with less paperwork. To complete the sale, Plaintiff Austin would need to provide only his Social Security Card, pay stubs, and blank money order in the amount of $500.00.

94.     Alternatively, Defendant Segura explained there was the "regular program" which required bank statements, Identification Card, social security card, pay stubs, and tax forms.

95.     Plaintiff Austin opted for the summer special and stated he wanted to purchase a home.  Defendant Segura said, "once you make the payments, you end up owning the home."  Defendant Segura never said that Plaintiff Austin would ever be a renter and subject to tenant eviction proceedings if he defaulted on the loan on the purchase of the property.

96.     Defendants provided Plaintiff Austin with listings via email and would provide him with updated listings as additional properties became available.  When he was interested in a house, Plaintiff Austin asked for the key to see the inside. Plaintiff Austin had to give a $10 deposit in exchange for the key to view the house. After he returned the key, he would receive his deposit back.

97.     Plaintiff Austin later discovered that Defendants pretend that different keys open different houses, but, in reality, one key is used for all the houses.

98.     In or around July 2016, Plaintiff Austin looked at the house located at 8115 Strathmoor in Detroit, Michigan.  Plaintiff Austin believed the house was satisfactory and the neighbors in the neighborhood seemed friendly.  While Plaintiff Austin recognized that some repairs were necessary, they seemed relatively minor and cosmetic in nature.

99.     On July 22, 2016, Plaintiff Austin met with Defendant Segura to discuss the terms of the financing and to review documents provided by Defendant Segura. The documents consisted of a real estate packet that included (a) Real Estate Purchase Agreement; (b) Lead-Paint and Lead-Based Paint Hazards Disclosure of Information for Residential Sales; (c) Seller's Disclosure Statement; (d) Property & Tax information; (e) Loan Amortization Calculator; and (f) Loan Amortization Schedule.  (Ex. 9, Closing Packet on July 22, 2016).

100.    Much of the nomenclature used in the Purchase Agreement is that of a purchase money mortgage financed by the seller.  The consumer is listed as the "Purchaser(s)."  A Parcel ID Number is listed.  There appears to be three different options for the prospective transaction: "LEASE WITH OPTION," "CASH SALE," and "CASH SALE WITH NEW MORTGAGE."

101.    The "LEASE WITH OPTION" under the Purchase Agreement contains filled in blanks for "option consideration," "balance," "monthly installments…for

principle (sic.) and interest," "fixed interest rate (per annum)," "for the (HRA) or property taxes" and an "administration fee."

102.   Under section (H) of the General Conditions, the Purchase Agreement form states: "H) Closing:  Subjects to all conditions herein, closing shall take place on or before TBD.  Purchase (sic.) shall be considered lessee, in as AS-IS lease, for the first four months and must complete the conditions in order to execute a Land Contract.  (see Ex.__, draft contract).  Upon completion, four monthly payments will be applied to the purchase price, option consideration shall be applied to purchase price principle (sic.) balance upon execution of Land Contract.  Land Contract will be fully executed when the Lease to Land Contract Authorization form is signed by both parties."

103.   For Lease with Option transactions, Defendants have two other key form documents called "Option to Purchase Agreement" and "Residential Lease with Option Agreement."  Both the Option to Purchase Agreement and Residential Lease with Option Agreement are designed and intended to be executed concurrently with the Purchase Agreement.

104.   The Option to Purchase Agreement sets forth, among other things, the option amount, the option deposit, the term of the option agreement (*i.e.*, the length of monthly payments required), and numerous default and forfeiture terms for the

26

option, including but not limited to, the tenant complying with "ALL terms of the rental agreement."

105. The Residential Lease with Option Agreement contains standard lease terms which purport to treat "Purchaser" as a mere tenant. Numerous pro-landlord terms are imposed on the "Purchaser" (defined as "TENANT" in the Residential Lease with Option Agreement). Among such terms are the tenant's waiver of the landlord's duty to maintain property in a habitable condition, the tenant's assumption of all burdens of repairing the premises and keeping the premises in reasonable repair and fit for habitability. Moreover, the Residential Lease with Option Agreement purports to transfer the possession of the premises "AS IS" and without representations regarding the condition of the premises. In addition, the Residential Lease with Option Agreement purports to provide the landlord with a quick remedy, including the summary proceeding eviction of the purchaser as a tenant rather than a summary proceeding for forfeiture of land contract, when the purchaser defaults. Also, the tenant/purchaser is expected to pay the property taxes and homeowner's insurance for the property.

106. In addition to the above-described documents presented to "purchaser(s)," Defendants provide a "Seller's Disclosure Statement" that indicates across its face that "**Seller Never Lived In Property**." The Seller's Disclosure Statement is designed and meant to be executed concurrently with the Purchase

Agreement, the Option to Purchase Agreement, and the Residential Lease with Option Agreement as part of a closing packet to alert the purchaser of any known defects.

107.    Defendant Segura went through the paperwork quickly, providing superficial, misleading explanations of the terms, crossing out some provisions as he discussed them.

108.    Defendant Segura told Plaintiff Austin that once he had made all of the payments, he would become the owner of the property. Defendant Segura never told Plaintiff Austin that he would be treated like a tenant and evicted from the property with little notice and no opportunity to redeem if he fell behind on his payments.

109.    All the while, Defendant Segura assured Plaintiff Austin that Defendants would "work with him" if he fell behind on his payments.

110.    Based on these representations, Plaintiff Austin signed the Real Estate Purchase Agreement and the other documents contained in the closing packet.

111.    Defendant never permitted Plaintiff to seek the assistance of counsel or to seek out assistance from an independent pre-loan counseling agency.

112.    Neither Defendant Segura nor any other Defendant provided Plaintiff with any disclosures prior to July 22, 2016.

113.    On July 29, 2016—after signing the purchase agreement—Plaintiff was asked to sign further after-the-fact documents to purchase the property. Plaintiff did

not understand why the additional documents were needed, but he was told he needed them to complete the sale. These included: (a) Lease Agreement Addendum; (b) Residential Lease with Option Agreement; (c) Application Fee; (d) Tenant Responsibilities to the Property; (e) Acknowledgement of Wayne County Property Tax Bill; (f) Acknowledgment of Water Bill Responsibility; and (g) Option to Purchase. (Ex. 10, Documents signed on July 29, 2016).

114.   What is more, when Plaintiff Austin arrived on July 29 to sign the additional documents, Defendant Segura claimed there had been a counter-offer for $30,000 and tried to get Plaintiff to agree to pay $27,000 instead of $22,900. Plaintiff Austin reminded Defendant Segura that they had a deal. Plaintiff Austin threatened to walk away. Mr. Segura suddenly changed his tune and agreed to consummate the transaction.

115.   Plaintiff Austin signed the documents. All the while, both on July 22, 2017 and July 29, 2016, Defendant Segura assured Plaintiff Austin that they would "work with him" if he fell behind on his payments.

116.   Plaintiff Austin's transaction had all the elements of a land contract under Michigan law, including the fact that Plaintiff's Real Estate Purchase Agreement is between Plaintiff and Defendants Mike Kelly and DPE, and that the buyer and seller agreed that the Plaintiff was purchasing property but would not receive the legal title until the debt had been satisfied. Under a typical Michigan

land contract, purchasers also immediately obtain equitable title while legal title remains with the seller. See, http://miforeclosureresponse.org/wp-content/uploads/2012/09/Land-Contract-Guide-FINAL.pdf.

117. Further, after signing the Purchase Agreement, Plaintiff Austin received monthly invoices indicating that he was purchasing the home at 8115 Strathmoor, as noted previously at paragraphs 61-65 of this Complaint. (See also, Ex. 6).

118. The interest rate on the loan to purchase the house was 10% on the principal amount of $22,200.00 and thus the transaction falls within a "high-cost mortgage" within the meaning of 12 C.F.R. § 1026.32(a)(1) because Plaintiff Austin's interest rate was 6.84 points above the average prime offer rate, which was 3.16% at the time. (Ex. 11, Average Prime Offer Rate Table, https://www.ffiec.gov/ratespread/aportables.htm).

119. Defendants did not disclose the annual percentage rate of the transaction, only the interest rate.

120. Defendants deceived Plaintiff Austin regarding the nature of the transaction, the documents he signed, and the condition of the house. Plaintiff Austin did not understand that Defendants would treat him as a mere renter. To the contrary, he reasonably believed he was purchasing a home.

121.    Defendant Mike Kelly signed the Lead Paint Disclosure form and Seller's Disclosure form as the "seller" to close the loan; he did so in his personal capacity without any designation as representative for any entity.

122.    When Plaintiff Austin selected the 8115 Strathmoor house, Defendants did not do a meaningful assessment of his ability to afford the property.  Based on information and belief, Defendants did not conduct a meaningful analysis of Plaintiff Austin's credit scores and histories.  Further, based on information and belief, Defendants did not consider whether Plaintiff Austin could afford the many significant repairs that Defendants knew the house would need. Moreover, based on information and belief, Defendants did not meaningfully consider Plaintiff's income to debt ratios.

123.    Plaintiff Austin's closing packet did not include, among other things:

- HOEPA's disclosure statement for a high-cost mortgage; or,

- Written certification that Plaintiff has obtained counseling on the advisability of the transaction from an appropriate counselor.

124.    After Plaintiff Austin closed on the property, he discovered that the house was dilapidated.  The basement flooded and destroyed the hot water tank and furnace. The basement had mold, and Plaintiff Austin had to rip out all drywall and install detectors for mold, carbon monoxide and other toxic fumes.  To make matters

worse, on a separate occasion, a portion of the roof the size of a 42-inch television caved in and leaked water into the house during a storm.

125.   Eventually, Plaintiff fell behind on his loan payments.  Instead of using forfeiture procedures, Defendants instituted three separate tenant summary proceedings to evict Plaintiff Austin from the property as a tenant, the most recent of which had a hearing date of April 20, 2018.

126.   For his hearing, Plaintiff Austin obtained counsel from Michigan Legal Services who raised the proper defense that treating the Plaintiff as a tenant in summary proceedings was inappropriate. Defendants agreed that land contract forfeiture was the proper proceeding in response to the default in payments.

127.   Therefore, as recently as April 20, 2018, the Defendants have continued to perpetrate their scheme and have continued their scheme's disparate impact against African-Americans.

128.   Ultimately, Plaintiff vacated the property but lost thousands of dollars of equity in the 8115 Strathmoor property.

### *Plaintiffs Natalie James and Jerome Day*

129.   In or around early 2016, Plaintiffs Natalie James and Jerome Day ("Natalie and Jerome" collectively) heard about Detroit Property Exchange, Detroit Houses, LLC and other Michael Kelly controlled entities offering to sell homes on land contract.

32

130.   Natalie and Jerome set up an appointment and met with Crystian Segura and other persons at 51 Hancock, Detroit, MI, and inquired about touring some homes.

131.   The office at 51 Hancock had numerous signs advertising the sale of homes on land contract terms, and Natalie and Jerome had seen other advertisements. (See, Ex. 12, Handyman Special Advertisement).

132.   Natalie and Jerome were provided a box of keys and were told they could tour any homes they wanted.

133.   They eventually toured 3469 Three Mile Dr, Detroit, MI, 48224.

134.   When they toured the home, they did not notice any obvious defects with the roof or other structural issues. There were no strange smells and the home did not have obvious signs of water damage. Most of the issues they noticed appeared minor in nature. However, the home was not perfect. The home was missing two doors from the back and side of the house, respectively, and the boiler and radiators were missing.

135.   Natalie and Jerome indicated that they were interested in purchasing the home, but they were concerned about the cost of replacing the boiler.

136.   Crystian Segura and his assistant, Chrystal, told Natalie and Jerome that the company would fix those issues and that the company would help them out with other repairs after they agreed to purchase the home.

33

137.   They met with Crystian Segura on or about May 10, 2016 to discuss the terms of purchase. Mr. Segura presented them with a number of documents, including a lease agreement and purchase agreement. He briefly went through the documents and had Natalie and Jerome sign. All the while, he promised that the company would help repair the property and that the company would "work with them" if they fell behind on their payments.

138.   The "Residential Lease with Option Agreement" and the "Purchase Agreement" are substantially similar to the documents signed by Plaintiff Carl Austin. (See, Ex. 13, Natalie James and Jerome Day Purchase Agreement and Lease Agreements).

139.   Natalie and Jerome also signed an "Option to Purchase Agreement." This has terms substantially similar to the Real Estate Purchase Agreement.

140.   The "Residential Lease with Option Agreement", the "Residential Purchase Agreement", and the "Option to Purchase Agreement" were all executed together at the same closing.

141.   Natalie and Jerome placed a $1,000 deposit on the property and were to pay $550 per month, $400 toward Principal and interest and $150 toward escrow for taxes.

142.   Natalie James and Jerome Day entered into their agreement to purchase the property on May 10, 2016 and are purchasing the property for $25,900 at 10%

interest for a term of 93 months (7.75 years). The transaction is a "high cost mortgage" under 12 C.F.R. § 1026.32(a)(1) because the interest rate was 6.73 points higher than the average prime offer rate, which was 3.27. (Ex. 11).

143.   Defendants did not provide Natalie and Jerome with disclosures prior to May 10, 2016.

144.   After Natalie and Jerome moved into the property, they learned that a previous tenant or owner had poured concrete into the pipes. (See Ex. 14, DPE acknowledging that Natalie James has reported that cement had been poured into the pipes).

145.   Defendant Segura represented that the company would repair the issue.

146.   No one ever came to repair any issues with the home.

147.   Natalie and Jerome have since obtained quotes from two contractors for the repair of the pipes and for the installation of a boiler. The cost of repairs would cost no less than $47,000. This is at least $21,800 more than Natalie and Jerome agreed to pay for the property. (Ex. 3).

148.   Natalie and Jerome continued to press DPE and Segura to honor their commitments. However, Defendant Segura was almost always in a "meeting" and whenever Natalie and Jerome would attempt to schedule an appointment, they would never receive a confirmation that the appointment was set.

149.   Each time Natalie and Jerome called the Collection Department to get answers, they were told that they were in the "buying" phase and so they could not get any help with repairs or other issues. However, when it suited DPE, personnel would tell Natalie and Jerome that they were still in the "renting phase."

150.   Eventually, Natalie went to the Detroit Building and Safety Department to get a city inspection of the home.

151.   A city inspector came out and inspected the home, finding 29 separate violations and provided 23 corrections orders, including but not limited to replacing the boiler and radiators, replacing the defective roof, replacing missing and defective gutters, replacing the ceiling within the home, replacing leaky waste pipes in bathroom, properly installing new electrical wiring and systems, and repairing basement walls to prevent leaks, among other violations. (See, Ex. 3).

152.   All the while, Natalie and Jerome were paying $550 each month for ownership of the property.

153.   As recently as March 15, 2018, DPE's billing statements listed Natalie and Jerome's payments in terms of "principal" and "interest", had allocated a loan number to Natalie and Jerome's account—HD3469Thr-RC—and provided a maturity date of November 15, 2023. (See, Ex. 4, Natalie James and Jerome Day Invoices).

154.   Further, on March 6, 2018, Mr. Segura, on behalf of Home of Detroit LLC and as the apparent agent for DPE entered into a "LAND CONTRACT ADDENDUM" with Natalie and Jerome that amended the "the original land contract signed and dated 06 day [sic] March 2018" concerning the property and authorizing the reduction of monthly payments from $550 to $450. (See, Ex. 5, Natalie James and Jerome Day Land Contract Addendum).

155.   Defendants' oral representations, their billing statements, their agreements, and the documents they provided to Natalie and Jerome demonstrate that Defendants consistently give every indication to Natalie and Jerome, as well as other members of the Class, that they were purchasing the home.

156.   Yet, on July 23, 2018 Mr. William Semaan (P-80352) on behalf of Homes of Detroit LLC filed an action for summary proceedings in the 36th District (Case no. 18356808) for non-payment of rent, attempting to evict Natalie and Jerome as tenants rather than vendees in a land contract. (See, Ex. 15, Natalie James and Jerome Day 36th District Docket Sheet).

157.   The suit was ultimately dismissed without prejudice by Mr. Semaan.

158.   Natalie and Jerome are still waiting for repairs to occur. After constantly attempting to contact Defendant Segura, they finally obtained a response. Mr. Segura informed them that Natalie and Jerome have three options: (1) sell the property, (2) accept a deed from Detroit Homes LLC in order to get a non-profit to

37

pay for repairs, but Natalie and Jerome must also execute a deed back to Detroit Homes LLC, or (3) make the repairs themselves.

## CLASS ACTION ALLEGATIONS

159.   Plaintiffs and the Class bring this Complaint as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3).

160.   Plaintiffs and the Class request that this Court certify one Class and one subclass, as follows.

161.   Plaintiffs and the Class request that this Court certify a Class of all persons who entered into a "residential mortgage transaction", as that term is used and defined in 15 U.S.C. § 1602(x) and 12 C.F.R. §1026.32(a)(1), with any Defendant  on or after November 12, 2015, excluding those (if any) who obtained title to the house without signing a deed back to any Defendant as a condition of being given the deed.

162.   Plaintiffs and the Class also request that this Court certify a Subclass of all persons who have entered into a land contract with any of the Defendants on or after November 12, 2015, excluding those (if any) who obtained title to the house without  signing a deed back to any Defendant as a condition of being given the deed, and where such persons executed a "high-cost mortgage" transaction as defined by 15 U.S.C. § 1602(bb).

163.   This action is properly maintained as a class action because:

a)     Joinder of all Class members is impracticable because of the size of the Class.  Plaintiffs understand that the Class includes more than 1,000 people, and that the smallest Subclass includes more than 1,000 people.

b)     Defendants have acted or refused to act on grounds generally applicable to the Class.

c)     The claims alleged on behalf of the Class and Subclass raise questions of law and fact that are common to the Class and Subclass and predominate over questions affecting only individual members because all Class members entered into the same or comparable written contracts with Defendants for the same program and received substandard housing under the program.  Common questions of law and fact include, among others:  (i) whether the land contract scheme as implemented by Defendants is unfair and predatory; (ii) whether Defendants are required to—but do not—make a reasonable and good faith determination that consumers have a reasonable ability to afford the transaction; (iii) whether Defendants are required to—but do not—provide the disclosures required by 15 U.S.C. § 1639(a), and whether they do so sufficiently in advance of when the contract is executed; (iv) whether Defendants are required to but do not exclude consumers who have not had pre-loan counseling;

d)    The claims of the class representatives are typical of the Class because the class representatives entered into residential mortgage transactions with Defendants that are the same as or comparable to the other class members' contracts, and they did so pursuant to the same housing scheme operated by Defendants and received similar sub-standard housing.

e)    A class action is superior to the other available methods for fairly and efficiently adjudicating this litigation.

164.    The Plaintiff class representatives and counsel will fairly and adequately represent the interests of the class.  The Plaintiffs have no interests that are antagonistic to the interests of the other class members and class counsel have extensive experience in civil rights, consumer, and class action litigation.

## INJURY TO NAMED INDIVIDUAL PLAINTIFFS

165.    Plaintiffs reallege all preceding paragraphs as if set forth herein.

166.    Plaintiffs have been injured by Defendants' scheme.

167.    This scheme leaves Defendants' customers to live in uninhabitable properties with the burden of the cost of repairs, property taxes, and homeowner's insurance and subject to eviction when they fall behind. This predatory combination of conditions is at the heart of Defendants' predatory scheme.  It harms every customer, regardless of whether they lose the house and what they understand about the transaction before they sign.

168.   As a direct, foreseeable, and proximate result of Defendants' actions, Plaintiffs have suffered significant financial injuries. These injuries include the full value of the payments they made to Defendants as "rent" when Defendants failed to provide habitable properties.

169.   These injuries also include the costs Plaintiffs have incurred in their efforts to make their respective properties habitable. Plaintiffs were will to make these investments because they believed they were becoming homeowners. These costs include out-of-pocket expenses beyond the cosmetic repairs Plaintiffs identified when they toured their respective properties and the value of the time they invested in repairing their respective houses.  In the absence of Defendants' actions, Plaintiffs would not have incurred these costs.

170.   These injuries also include any extra payments made by the Plaintiffs to reduce the principal balance on their respective loans.

171.   25 U.S.C. § 1640(a) provides statutory damages in connection with the TILA and HOEPA violations of (a) up to the lesser of $1 million or 1% of Defendants' net worth, plus (b) all finance charges and fees paid, as well as costs and a reasonable attorneys' fee.

172.   For violations of 15 U.S.C. §1639b, Defendant Segura is liable to the Plaintiffs and any class members for the greater of actual damages or an amount equal to three times the total amount of direct and indirect compensation or gain

accruing to the mortgage originator in connection with the residential mortgage loan involved in the violation, plus costs and a reasonable attorneys' fee.

173.   Defendant Kelly is liable for Defendant Segura's actions because Defendant Segura acted as Defendant Kelly's agent, and Defendant Segura acted pursuant to Defendant Kelly's direction, supervision, and within the scope of his agency and employment.

174.   As a direct, foreseeable, and proximate result of Defendants' actions, Plaintiffs have suffered, and in the future will continue to suffer, humiliation, embarrassment, and mental and emotional distress.

175.   In causing injury to Plaintiffs and the Class, Defendants have acted intentionally, maliciously, and with willful, callous, wanton, and reckless disregard for the rights of the Plaintiffs and the Class.

## CAUSES OF ACTION

### Count I

**Violation of the HOEPA (Mandatory Disclosures),**
**15 U.S.C. § 1639(a), 12 C.F.R. § 1026.32(c)**
**(As to DPE, Suena Homes, and Homes of Detroit, LLC)**

176.   Plaintiffs reallege and incorporate all prior allegations as if set forth fully herein.

177.   Defendants are engaged in the practice of using high-cost mortgages that fall within the meaning of 12 C.F.R. § 1026.32(a)(1) of the HOEPA to sell their

homes. These high-cost mortgages involve any consumer credit transaction that is secured by the consumer's principal dwelling in which there is a first mortgage and the Annual Percentage Rate ("APR") is more than 6.5 percentage points higher than the average prime offer rate, which is an estimate of the rate people with good credit typically pay for a similar first mortgage.

178. Defendants Suena Homes, Homes of Detroit, LLC and DPE are "creditors" within the meaning of 12 C.F.R. § 1026.2(a)(17).

179. Defendants have extended the high-cost mortgages at issue without providing a disclosure stating: "You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application. If you obtain this loan, the lender will have a mortgage on your home. You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan."

180. Further, Defendants failed to provide other disclosures required by Title 15, Chapter 41, Subchapter I. This violates 15 U.S.C. § 1639(a) and 12 C.F.R. § 1026.32(c).

## Count II

**Violation of the TILA and HOEPA (Ability to Repay),**
**15 U.S.C. § 1639c(a), 15 U.S.C. § 1639(h), 12 C.F.R. § 1026.43(c)**
**(As to DPE, Suena Homes, and Homes of Detroit, LLC)**

181.   Plaintiffs reallege and incorporate all prior allegations as if set forth fully herein.

182.   The transactions at issue are "high-cost covered transactions" within the meaning of 12 C.F.R. § 1026.43(b)(4).  This section applies to any consumer credit transaction that is secured by a dwelling, including any real property attached to a dwelling.  The transaction also involves a dwelling as defined in § 1026.2(a)(19), which means a residential structure that contains one to four units, whether or not that structure is attached to real property. The term includes an individual condominium unit, cooperative unit, mobile home, and trailer, if it is used as a residence.

183.   Defendants Suena Homes, Homes of Detroit LLC, and DPE are "creditors" as defined in 12 C.F.R. § 1026.2(a) (17)(i) which means "A person who regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than four installments (not including a down payment), and to whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is no note or contract."  Here, the transactions at issue constitute written agreements that extend credit for the purchase of a residence.

184.   Defendants have initiated the covered transactions at issue without making a reasonable and good faith determination at or before consummation that the consumer will have a reasonable ability to repay the loan according to its terms.

185.   Based on information and belief, consumers default on the loans that are made based on the written agreements to purchase a home.

186.   Based on information and belief, the creditors' underwriting standards—to the extent any such standards exist—have historically resulted in comparatively high levels of delinquency and default.

187.   As a result, Defendants Suena Homes, Homes of Detroit, LLC, and DPE are in violation of 15 U.S.C. § 1639c(a) and 12 C.F.R. § 1026.43(c).

### Count III

**Violation of the HOEPA (Pre-Loan Counseling),
15 U.S.C. § 1639(u), 12 C.F.R. § 1026.34(a)(5)
(as to DPE, Suena Homes, and Homes of Detroit, LLC)**

188.   Plaintiffs reallege and incorporate by all prior allegations as if set forth fully herein.

189.   The transactions at issue are "high-cost mortgages" within the meaning of 12 C.F.R. § 1026.32(a)(1). These high-cost mortgages involve any consumer credit transaction that is secured by the consumer's principal dwelling in which there is a first mortgage and the Annual Percentage Rate ("APR") is more

than 6.5 percentage points higher than the average prime offer rate, which is an estimate of the rate people with good credit typically pay for a similar first mortgage.

190.   Defendants Suena Homes, Homes of Detroit, LLC, and DPE are "creditors" within the meaning of 12 C.F.R. § 1026.2(a)(17) (i) which means "A person who regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than four installments (not including a down payment), and to whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is no note or contract."

191.   Here, the Real Estate Agreements constitute written agreements that extend credit for the purchase of a residence.

192.   Defendants have extended the high-cost mortgages at issue without receiving written certification that the consumer has obtained counseling on the advisability of the transaction from an appropriate counselor, in violation of 15 U.S.C. § 1639(u) and 12 C.F.R. § 1026.34(a)(5).

## Count IV

### Violation of the TILA (Loan Origination), 15 U.S.C. § 1639b (as to Defendant Crystian Segura)

193.   Plaintiffs reallege and incorporate by reference all prior allegations as if set forth fully herein.

194.   Congress enacted 15 U.S.C. § 1639b to "assure that consumers are offered and receive residential mortgage loans on terms that reasonably reflect their

ability to repay the loans and that are understandable and not unfair, deceptive or abusive."

195.   The transactions at issue are "residential mortgage transactions" as defined by 15 U.S.C. § 1602(x), which "term "residential mortgage transaction" means a transaction in which a mortgage, deed of trust, purchase money security interest arising under an installment sales contract, or equivalent consensual security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling."  A land contract is a residential mortgage transaction under this section.

196.   Defendant Crystian Segura is a "person" as defined by 15 U.S.C. § 1602(e).

197.   Defendant Crystian Segura, is a "mortgage originator" as defined by 15 U.S.C. § 1602(dd)(2).  The term "mortgage originator"-- (A) means any person who, for direct or indirect compensation or gain, or in the expectation of direct or indirect compensation or gain--  (i) takes a residential mortgage loan application; (ii) assists a consumer in obtaining or applying to obtain a residential mortgage loan; or (iii) offers or negotiates terms of a residential mortgage loan; (B) includes any person who represents to the public, through advertising or other means of communicating or providing information (including the use of business cards, stationery, brochures,

signs, rate lists, or other promotional items), that such person can or will provide any of the services or perform any of the activities described in subparagraph (A).

198.   Defendant Segura takes the residential loan application and documents, negotiates the terms, and assists the consumer in executing the documents.

199.   Based on information and belief, Defendant Segura does not make a reasonable, good faith determination of a consumer's ability to repay the land contract pursuant to its terms.

200.   The terms of these land contracts, which constitute "high cost mortgages," have abusive and predatory characteristics and have high interest rates.

201.   Defendant Segura regularly and habitually engages in the business of originating residential mortgage transactions as part of a commercial enterprise.

202.   Based on information and belief, consumers default on the loans' terms within a short time after consummation.

203.   Based on information and belief, the underwriting standards used by Michael Kelly, Crystian Segura, and Michael Kelly's entities—DPE, Suena Homes, and Homes of Detroit, LLC, to the extent they have underwriting standards at all— have historically resulted in comparatively high levels of delinquency and default.

204.   Based on information and belief, Crystian Segura is not a licensed mortgage originator in accordance with Michigan or Federal Law.

205.   Based on information and belief, Crystian Segura by and through his entities has never included any unique identifier provided by the Nationwide Mortgage System and Registry.

206.   By engaging in the above activities, including, without limitation, originating loans without a license that contain abusive, predatory terms, and without making a good faith, reasonable determination that Plaintiffs and class members had the reasonable ability to repay the loans, Crystian Segura has damaged Plaintiffs and the Class and violated 15 U.S.C. §1639b.

## Count V

### Violation of TILA (Loan Origination), 15 U.S.C. § 1639b
### (as to DPE, Homes of Detroit, LLC, and Suena Homes)

207.   Plaintiffs reallege and incorporate all prior allegations as if set forth fully herein.

208.   Suena Homes, Homes of Detroit, LLC, and Detroit Property Exchange, among others, advertise that the properties can be purchased by consumers through seller-financing, specifically through the utilization of land contracts.

209.   When consumers select a property to purchase, they work with Defendant Segura, an agent for Suena Homes, Homes of Detroit, LLC, and Detroit Property Exchange, to discuss terms and sign seller-financing documents as part of residential mortgage transactions.

210.   Based on knowledge and belief, consumers are offered seller financing, and they are only shown homes that are owned by Michael Kelly or an entity he owns or controls.

211.   Based on knowledge and belief, Suena Homes, Homes of Detroit, LLC, and DPE do not offer to bring consumers together with non-Michael-Kelly-related third parties.

212.   Based on knowledge and belief, Michael Kelly operates his entities with the purpose and intent of having these entities originate seller-financed residential mortgage transactions with Plaintiffs and other consumers located in Detroit, MI.

213.   The terms of these residential mortgage transactions are deceptive, have high interest rates, and contain predatory characteristics.

214.   Based on information and belief, neither Michael Kelly, DPE, Homes of Detroit, LLC, and Suena Homes, nor any of their agents, utilize underwriting standards that would provide a good faith, reasonable determination that a purchaser can afford the residential mortgage transaction.

215.   Based on information and belief, Mr. Kelly, by and through DPE, Suena Homes, and Homes of Detroit, LLC, repetitively and habitually engages in residential mortgage transactions as a commercial enterprise.

216.   As a result of this activity, Michael Kelly, by and through his owned entities, has reaped millions of dollars of revenues and profits from Plaintiffs and other consumers.

217.   DPE, Suena Homes, and Homes of Detroit, LLC engaged in the same conduct with Plaintiffs and other similarly situated.

218.   Based on information and belief, Crystian Segura is an agent of multiple entities owned and controlled by Defendant Michael Kelly.

219.   Based on information and belief, Crystian Segura is an agent of Michael Kelly and the entities Michael Kelly controls, including but not limited to DPE, Suena Homes, and Homes of Detroit, LLC.

220.   Based on information and belief, DPE, Homes of Detroit, LLC, and Suena Homes, by and through Michael Kelly's direction, utilized Defendant Segura on a day-to-day basis to meet with potential victims, discuss land contract terms, and originate seller financed purchases of Michael Kelly's dilapidated properties.

221.   Based on information and belief, consumers default on the loan's terms in a short time after consummation.

222.   Based on information and belief, the underwriting standards used by DPE, Suena Homes, and Homes of Detroit, LLC—to the extent they have underwriting standards at all—have historically resulted in comparatively high levels of delinquency and default.

## Count VI

### Piercing the Corporate Veil
### (As to Suena Homes, Homes of Detroit, LLC, and DPE)

223. Plaintiffs reallege and incorporate all prior allegations as if set forth fully herein.

224. Based on information and belief, Michael Kelly is the owner, operator, and managing member of Suena Homes, Homes of Detroit, LLC and DPE, among other entities.

225. Based on information and belief, Michael Kelly has exercised control over these entities in such a manner as to wrong the Plaintiffs and the Class by, *inter alia*, perpetrating a scheme to utilize land contract seller-financing to lure them into high interest, deceptive, confusing, predatory, and deleterious agreements to purchase dilapidated homes and failing to perform the responsibilities imposed upon them by TILA and HOEPA in violation of federal law. Further, in an attempt to skirt around TILA and HOEPA, Defendants claim that the Plaintiffs and the Class were mere renters and sought to evict them as tenants, even though Defendant Kelly, other agents of DPE, Homes of Detroit, LLC, and Suena Homes had consistently represented to Plaintiffs and Class members through oral and documentary representations that Plaintiffs and the Class members were purchasing the respective properties.

226.   In addition, the Study has shown that "*Detroit Property Exchange initiated more evictions order than properties it owned with a ratio of 1.49 cases for each property in DPE's inventory.*"

227.   What is more, the Study concluded that "*Though the relationship between land contracts and evictions for Detroit Property Exchange is the most extreme with 1.49 evictions per property, the predatory activity of this company and its many shells has persisted unabated in the city for decades*."

228.   This study, among other evidence, demonstrates that Michael Kelly, by and through DPE and other entities, has crafted seller-financing land contract agreements utilizing underwriting standards (if any standards are used at all) that have historically resulted in comparatively high levels of delinquency and default.

229.   Further, based on information and belief, consumers default on these agreements within a short time after consummation.

230.   Based on information and belief, this behavior has been ongoing for years with no sign of abatement.

231.   The nature and extent of this behavior, spanning years and likely thousands of defaults and evictions, demonstrates, among other evidence, that Michael Kelly is using Suena Homes, DPE, Homes of Detroit, LLC, and other entities as his instrumentalities to perpetrate a predatory lending scheme that is in violation of federal law.

232.   Unless the corporate veil is pierced, Michael Kelly will likely create new entities, or utilize other existing ones he may own, to perpetrate the same scheme under new names that are not encumbered by a money judgment or injunctive relief.

## Count VII

### Aiding and Abetting
### (As to Defendant Michael Kelly)

233.   Plaintiffs reallege and incorporate all prior allegations as if set forth fully herein.

234.   As stated, the Defendants, at relevant times, violated the Truth in Lending Act and the Home Ownership Equity Protection Act, and they also owed various legal obligations to Plaintiffs and the Class under these statutes, as well as at common law.

235.   As a result of the conduct described herein, the Defendants have breached their duties and obligations, serving their own interests above those of Plaintiffs and the Class, violating the Truth in Lending Act and the Home Ownership Equity Protection Act, and other wrongful conduct, in a myriad of ways, including by misrepresenting the status of Plaintiffs and the Class as tenants rather than vendees when proceeding to summary proceedings to remove Plaintiffs and Class members from their respective properties.

236.   The Defendant Michael Kelly perpetrated this, and other, unlawful conduct—or in the alternative knowingly aiding and abetting the Co-Defendants—as part of a scheme to deprive Plaintiffs and the Class of their rights of home ownership and forfeiture rights under a land contract, while enriching themselves.

237.   Michael Kelly knowingly participated in the wrongful conduct of the Co-Defendants, causing substantial damages to Plaintiffs.

238.   Among other things, Defendant Kelly knowingly, intentionally, and with bad faith and malicious intent aided and abetted the Co-Defendants in the perpetration of violations of the Home Ownership Equity Protection Act, in addition to the frauds, breaches of contracts, misrepresentations, civil conspiracies, unjust enrichments, and other illegal conduct.

239.   All Defendant Kelly's conduct in this regard was carried out with full knowledge that he was participating in and aiding and abetting these various wrongs.

240.   At all relevant times, the Defendant Kelly knew that he was aiding and abetting the Co-Defendants to accomplish these unlawful ends.

241.   For example, and among other things, Defendant Kelly knowingly assisted, aided, encouraged and facilitated the above wrongful conduct of his Co-Defendants in, among other things, signing the Lead-Paint and Lead-Based Hazards Disclosure of Information for Residential Sales form and the Seller Disclosure Form in connection with the closing on the sale of the properties, among other wrongs.

242.   Defendant Kelly was also instrumental in negotiating and facilitating the sale of the properties to Plaintiffs and the Class by his formation of DPE, Homes of Detroit, LLC, and Suena Homes, as agent to carry out the land contract scheme.

243.   Defendant Kelly engaged in this scheme to enrich himself.

244.   Defendant Kelly executed certain sale documents, in his own individual capacity, thereby approving, ratifying, and allowing the violations of Home Ownership Equity Protection Act in connection with the sale of the properties to Plaintiffs.

245.   The result of the Defendant Kelly's aiding and abetting the Co-Defendants, and Defendant Kelly's orchestration thereof, was to completely, and wrongfully, violate the Home Ownership Equity Protection Act and causing Plaintiffs and the Class to incur substantial damages.

246.   Defendant Kelly's conduct is and has at all times been willful, wanton and malicious, and Plaintiffs and the Class are therefore entitled to exemplary damages.

## **Count VIII**

### **DECLARATORY JUDGMENT**
### **(As to DPE, Suena Homes, and Homes of Detroit)**

247.   Plaintiffs reallege and incorporate all prior allegations as if set forth fully herein.

248. The transactions described within the Complaint create an actual controversy that places the parties in a position of uncertainty as to their respective rights in real property.

249. Plaintiffs and the Class have no remedy other than declaratory judgment that could adequately protect their equitable ownership interest in their homes.

250. Plaintiffs request that the Court hold that the transactions entered into between the Plaintiffs and certain Defendants are "residential mortgage transactions" within the meaning of 15 U.S.C. § 1602(x).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class respectfully pray that the Court grant them the following relief:

A. Enter a declaratory judgment that the transactions entered into between various Defendants and the Plaintiffs and the Class are residential mortgage transactions within the meaning of 15 U.S.C. § 1602(x).

B. Enter a declaratory judgment that the foregoing acts, policies, and practices of Defendants violate 15 U.S.C. §§ 1639, 1639b, and 1639c;

C. Enter a permanent injunction enjoining Defendants and their directors, officers, agents, and employees from continuing to publish, implement, and enforce the illegal conduct described herein and directing Defendants and their directors,

officers, agents, and employees to take all affirmative steps necessary to remedy the effects of that conduct and to prevent additional instances of such conduct or similar conduct from occurring in the future;

D.    Award compensatory damages to Plaintiffs and the Class in an amount to be determined by the jury that would fully compensate them for their injuries caused by the conduct of Defendants alleged herein;

E.    Award statutory damages to Plaintiffs and the Class in an amount to be determined by the Court in accordance with 15 U.S.C. § 1640(a)(2)(B), and statutory damages in accordance with 15 U.S.C. § 1640(a)(4);

F.    Award punitive damages to Plaintiffs and the Class in an amount to be determined by the jury that would punish Defendants for the willful, wanton, and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

G.    Award Plaintiffs and the Class their reasonable attorneys' fees and costs pursuant to 15 U.S.C. §§ 1640(a)(3); and

H.    Order such other relief as this Court deems just and equitable.

Respectfully submitted,
*Attorneys for Plaintiffs*

November 19, 2018

/s/*Theresamarie Mantese*
Theresamarie Mantese (P53275)
James A. Buster (P81186)
**MANTESE HONIGMAN, P.C.**
1361 E. Big Beaver Rd.

Troy, Michigan 48083
(248) 457-9200
gmantese@manteselaw.com
tmantese@manteselaw.com
jbuster@manteselaw.com

Marilyn Mullane (P30998)
Joe McGuire (P75571)
**MICHIGAN LEGAL SERVICES**
2727 Second Avenue, Ste. 333
Mailbox #37
Detroit, MI 48201
(313) 964-4130 ext. 403
mmullane@milegalservices.org
jmcguire@milegalservices.org

## DEMAND FOR JURY TRIAL

Plaintiffs request trial by jury as to all issues so triable.

Respectfully submitted,
*Attorneys for Plaintiffs*

November 19, 2018

/s/*Theresamarie Mantese*
Theresamarie Mantese (P53275)
James A. Buster (P81186)
**MANTESE HONIGMAN, P.C.**
1361 E. Big Beaver Rd.
Troy, Michigan 48083
(248) 457-9200
gmantese@manteselaw.com
tmantese@manteselaw.com
jbuster@manteselaw.com

Marilyn Mullane (P30998)
Joe McGuire (P75571)
**MICHIGAN LEGAL SERVICES**
2727 Second Avenue, Ste. 333

Mailbox #37
Detroit, MI 48201
(313) 964-4130 ext. 403
mmullane@milegalservices.org
jmcguire@milegalservices.org