## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

NATALIE JAMES, individually, and
on behalf of all others similarly
situated,
JEROME DAY, individually, and on
behalf of all others similarly situated,
CARL AUSTIN, individually, and on
behalf of all others similarly situated,
VERONICA SHERRELL, individually
and on behalf of all others similarly
situated,
ANDRE MACK, individually and on
behalf of those similarly situated, and
ERIC INGRAM, individually and on
behalf of all others similarly situated

       *Plaintiffs*,

     v.

DETROIT PROPERTY EXCHANGE,
a Michigan Corporation, SUENA
HOMES REALTY LLC, a Michigan
Limited Liability Company, HOMES
OF DETROIT, LLC, a Michigan
Limited Liability Company,
GREATER DETROIT, LLC, a
Michigan Limited Liability Company,
AMERICAN TAX REFUND LLC, a
Michigan Limited Liability Company,
MONTLIEU, LC, a Michigan Limited
Liability Company, CRYSTIAN
SEGURA, an individual and
MICHAEL KELLY, an individual,
jointly and severally,

       *Defendants*.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Hon. Sean Cox

Civil Action No. 18-cv-13601

**JURY TRIAL DEMANDED**

**CLASS ACTION COMPLAINT**

## RECORDS PRESERVATION NOTICE

**You are hereby notified to preserve during the pendency of this action all records and documents in all forms and formats (digital, electronic, film, magnetic, optical, print, etc.) that are relevant or may lead to relevant information, and to notify your employees, agents and contractors that they are required to take appropriate action to do the same.**

## CLASS ACTION COMPLAINT

Plaintiffs Natalie James, Jerome Day, Carl Austin, Veronica Sherrell, Eric Ingram, and Andre Mack bring this class action complaint, on behalf of themselves and all others similarly situated, against Defendants Detroit Property Exchange ("DPE"), Suena Homes Realty LLC ("Suena Homes"), Homes of Detroit, LLC, American Tax Refund, LLC, Greater Detroit, LLC, Crystian Segura ("Defendant Segura"), and Michael G. Kelly ("Defendant Kelly") (collectively "Defendants").

## NATURE OF ACTION

1. This action arises out of Defendants' abusive, predatory land contract scheme in Detroit wherein Defendants (1) attract potential purchasers with the possibility of home ownership, (2) have the purchasers sign ambiguous, opaque contracts with high interest rates that attempt to get around Truth in Lending Act and Homeownership Equity Protection Act provisions, (3) provide the purchasers every indication before and after signing documents that the purchasers are buying a home to encourage them to keep paying the monthly payments and to repair the dilapidated properties, (4) later *evict the purchasers as tenants* (rather than utilizing the

2

appropriate proceedings provided by law to regain possession from a property to which the purchaser has equitable title as provided by law) based on Defendants' intentional use of ambiguous, confusing, and cherry-picked language when the purchaser almost inevitably gets behind on the payments because Defendants failed to conduct an ability-to-repay analysis, and (5) then restart the process with a new, unsuspecting purchaser. By engaging in the above conduct, Defendants have violated the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq*., and the Home Ownership Equity Protection Act ("HOEPA"), 15 U.S.C. 1639, *et seq*.

2.      In substance, notwithstanding the Defendants sprinkling of words such as "lease" or "option", these are purchase money security transactions in which the consumer is purchasing the property, paying interest and principal, taking on all the responsibilities of ownership. Plaintiffs and the Class intend to buy, and they are told by Defendants that the documentation they sign do just that, and Defendants continue to represent to them—through various means, such as by sending them IRS form 1098s—that they are purchasers, not tenants.

3.      Defendants' seller-financed transactions are residential mortgage transactions within the meaning of 15 U.S.C. § 1602(x), 12 C.F.R. § 1026.32(a)(1), and many are also "high-cost mortgages" within the meaning of 15 U.S.C. § 1602(bb).  As such, TILA and HOEPA provisions govern Defendants' conduct and these transactions.

3

4.     Generally, and as set forth in more detail within this Complaint, certain Defendants have violated section 1639(b) by creating, negotiating, and extending seller-financing to purchasers that have predatory characteristics and steering the consumers toward these predatory loans without considering the purchasers' reasonable ability to repay the loan.

5.     Generally, and as set forth in more detail within this Complaint, certain Defendants have violated section 1639(c) of TILA by failing to meaningfully collect and analyze consumer financial data to make a reasonable, good faith determination that purchasers could repay the loans.

6.     Further, as set forth in more detail within this Complaint, Defendants have extended "high-cost mortgages" to Plaintiffs and the Class without complying with the HOEPA. High-cost mortgages involve any consumer credit transaction that is secured by the consumer's principal dwelling in which there is a first mortgage and the Annual Percentage Rate ("APR") is more than 6.50 percentage points higher than the average prime offer rate.

7.     Specifically, Defendants have violated section 1639 of the HOEPA by, *inter alia*, failing to provide mandatory disclosures to Plaintiffs and the Class as required by section 1639(a) and (b), failing to determine the Plaintiffs' and the Class's ability to repay the high-cost loans as required by section 1639(h), and failing

4

to ensure that Plaintiffs and the Class obtain pre-loan counseling as required by section 1639(u), as well as other violations stated herein.

## JURISDICTION AND VENUE

8.      Jurisdiction is conferred on this Court over the subject matter of this Complaint by 42 U.S.C. § 3613(a), 15 U.S.C. § 1640(e), and 28 U.S.C. §§ 1331 and 1367.

9.      Defendants have violated the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*, and the Home Ownership Equity Protection Act, 15 U.S.C. 1639, *et seq*.

10.      Defendants DPE, Homes of Detroit, LLC and Suena Homes, Greater Detroit, LLC, and American Tax Refund, LLC are "creditors" as defined in 15 U.S.C. § 1602(g).

11.      The Plaintiffs and each Defendant are separately a "person" as that term is defined in 15 U.S.C. § 1602(e).

12.      Defendants DPE, Homes of Detroit, LLC, Suena Homes, Greater Detroit, LLC, and American Tax Refund, LLC extended "credit" to Plaintiffs as that term is defined in 15 U.S.C. § 1602(f).

13.      The Defendants engaged in a "credit sale" with Plaintiffs as that term is used in 15 U.S.C. § 1602(h).

14.      The Plaintiffs are "consumers" as that term is defined in 15 U.S.C. § 1602(i).

15.     The Plaintiffs and Defendants engaged in "consumer credit," "residential mortgage," and "high-cost mortgage" transactions as those terms are defined in 15 U.S.C. § 1602(i), 15 U.S.C. § 1602(x) and 15 U.S.C. § 1602(bb).

16.     The real estate that is the subject of this Complaint is located within Detroit, Wayne County, Michigan and is a "dwelling" as that term is defined in 15 U.S.C. § 1602(w).

17.     Crystian Segura, DPE, Homes of Detroit, LLC, Suena Homes, Greater Detroit, LLC and American Tax Refund, LLC, and Dream Realty are "mortgage originators" as the term is defined in 15 U.S.C. § 1602(dd)(2).

18.     The alleged violations occurred and substantially all the events, transactions, and occurrences relevant to this lawsuit arose within the geographical boundaries of Detroit, Michigan. Therefore, venue is proper in this Court.

## THE PARTIES

19.     Plaintiffs were or currently are, at all relevant times, residents of Detroit, and/or Wayne County, Michigan.

20.     DPE regularly engages in the business of land contract lending and does substantial land contract business in Detroit, Michigan. DPE is a Michigan corporation in good standing with its principal place of business located at 51 W. Hancock Street, Detroit, MI 48201.

21.     Suena Homes regularly engages in the business of land contract lending and does substantial land contract business in Detroit, Michigan. Suena Homes is a Michigan limited liability company in good standing with its principal place of business located at 51 W. Hancock Street, Detroit, Michigan, 48201.

22.     Homes of Detroit, LLC regularly engages in the business of land contract lending and does substantial land contract business in Detroit, Michigan. Homes of Detroit, LLC is a Michigan limited liability company in good standing with its principal place of business located at 51 W. Hancock, Detroit, MI, 48201.

23.     Greater Detroit, LLC regularly engages in the business of land contract lending. Greater Detroit, LLC is a Michigan limited liability company in good standing with its principal place of business located at 51 W. Hancock, Detroit, MI, 48201.

24.     American Tax Refund regularly engages in the business of land contract lending. American Tax Refund, LLC is a Michgian limited liability company in good standing with its principal place of business located at 51 W. Hancock, Detroit, MI, 48201.

25.     Crystian Segura is a licensed real estate agent in the State of Michigan, license number 6501384416 whose license lapsed on October 31, 2018.

26.     Upon information and belief, Crystian Segura resides in Shelby Township, Michigan.

7

27.    Luis Machado is a licensed real estate agent in the State of Michigan, license number 6501391842.

28.    Luis Machado's business card states "Dream Realty USA" across the top, and lists its website as www.dreamrealtyusa.com. Its address is listed as 51 W. Hancock on both the website and Mr. Machado's business card.

29.    The email address on Mr. Machado's business card is a Detroit Property Exchange email address.

30.    Dream Realty USA, LLC is a Michigan limited liability company in good standing and, based on information and belief, is owned and controlled by Michael Kelly.

31.    Dream Realty USA's website lists Michael Kelly as "Broker" and Luis Machado as "Agent."

32.    Further, Dream Realty USA's website purports to provide real estate brokerage services to the public.

33.    Based on a search on the Michigan Department of Licensing and Regulatory Affairs website as of 3:00pm, February 28, 2019, Dream Realty USA LLC is not a licensed Real Estate Broker Company.

34.    Dream Realty Company, however, is a licensed Real Estate Broker Company, license number 6505381811.

35.    Dream Realty Company is owned and controlled by Michael Kelly.

36.     Michael Kelly is a licensed real estate broker in the State of Michigan, license number 6502381812.

37.     Upon information and belief, Michael Kelly owns and operates DPE, Homes of Detroit, LLC, Suena Homes, Greater Detroit, LLC, American Tax Refund, LLC, and Montlieu LC which operate and transact business in Detroit, Michigan.

36.     Upon information and belief, Michael Kelly operates a land contract scheme through a series of entities that he directs and controls, including, without limitation, Suena Homes, DPE, Homes of Detroit, LLC, Greater Detroit, LLC, American Tax Refund, LLC, Dream Realty Co., and Dream Realty USA, LLC. (See, Ex. 1, List of Kelly owned entities).

37.     Upon information and belief, Michael Kelly is a resident of Grosse Pointe Woods, Michigan.

## FACTUAL BACKGROUND

### I.  Land Contract – the Instrument

38.     A land contract, sometimes referred to as a contract for deed, is a method of seller financing utilized to purchase real property. In these contracts, the buyer becomes obligated to pay a certain purchase price at a certain interest rate over a period of time (usually a term of years), but he or she does not obtain the deed to the property until the full purchase price has been paid. Nonetheless, the buyer takes on the obligations of home ownership: the buyer pays the property taxes, obtains

9

homeowner's insurance, and make any needed repairs to the property. If the buyer defaults during the term of years, the contract usually purports to allow the seller to cancel (or "forfeit") the land contract, keep all payments made by the buyer, and evict the buyer through a forfeiture proceeding which has less protections and due process than judicial foreclosure, but more protections and due process than a summary proceeding to evict a tenant.

39.     In Michigan, while the vendor holds "legal" title to the real estate, the vendee holds equitable title. *Graves v American Acceptance Mortg. Corp.*, 469 Mich. 608, 615 677 N.W.2d 829, 833-834 (2004); see also, *Batton-Jajuga v. Farm Bureau General Ins. Co. of Michigan*, 322 Mich. App. 422, 432-433 913 N.W.2d 351, 356 (2017) (Citing *Graves* and holding that "under Michigan law, [the Vendee] is the owner of the…property, holding equitable title to it, while the vendor holds legal title in trust for her until the conditions of the land contract are fulfilled."

40.     Michigan law further recognizes the doctrine of declaring a transaction to be an equitable mortgage, with the Michigan Supreme Court stating, "… a court must look squarely at the real nature of the transaction, thus avoiding so far as lies within its power, the betrayal of justice by the cloak of words, the contrivances of form, or the paper tigers of the crafty. We are interested not in form or color but in nature and substance." *Wilcox v. Moore*, 354 Mich. 499, 504 93. N.W.2d 288, 291 (1958).

10

41.     Under this doctrine, a court even has the power to state that deed absolute on its face is not a pure conveyance, but a mortgage. *Grant v. Van Reken*, 71 Mich. App. 121, 125, 246 N.W.2d 348, 350 (1976)

42.     Plaintiffs and the Class assert that the transactions discussed within this Complaint as part of the scheme perpetrated by Defendants are, in substance, purchase money transactions in which the consumer is purchasing the property in exchange for title and the Defendants sellers have agreed to sell, and that the transaction is either a land contract or, in the alternative, an equitable mortgage, based on the facts and circumstances presented in this Complaint and based upon the manner in which Defendants have consistently perpetrated the scheme.

43.     As such, the Plaintiffs and Class Members who still reside in their homes either hold legal or equitable title to their homes, as appropriate, under law and equity.

44.     Land contracts and/ or equitable mortgages[1] are residential mortgage transactions that are subject to TILA, HOEPA, and various regulations. *See e.g.,* 15 U.S.C. § 1602(x) ("The term 'residential mortgage transaction' means a transaction in which a mortgage, deed of trust, purchase money security interest arising under

---

[1] From this point forward, for simplicity, the Complaint will utilize the word "Land Contract" or "purchase money transaction" to mean both a land contract transaction and/or an equitable mortgage to avoid duplication of stating both concepts continuously.

an installment sales contract, or equivalent consensual security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling"); *see also,* 12 C.F.R. 1026.32(a)(1)(stating that a high-cost mortgage is "any consumer credit transaction that is secured by the consumer's principal residence…" that meets certain criteria such as having an APR that exceeds the average prime offer rate by 6.50 percentage points for a first-lien transaction).

45.     Land contracts and equitable mortgages in the context of this case are "consumer credit transactions" within the meaning of 15 U.S.C. §1602(i) because they are "one[s] in which the party to whom credit is ... extended is a natural person, and the ... subject of the transaction [is] primarily for personal ... purposes." *Robertson v. U.S. Bank, N.A.*, 831 F.3d 757, 763 (6th Cir. 2016).

## II.  THE SCHEME

### *Step 1: Acquire Cheap, Dilapidated Properties*

46.     Defendants lure potential purchasers in with hopes of attaining the American Dream and attempt to perform a real estate bait-and-switch within the effectuating documentation. Defendants take as much money from Plaintiffs and the Class up front and within a short period of time as possible, and then, once they fall behind, evict them as tenants—even though Plaintiffs and the Class are (and have been continuously told and led to believe they are) purchasing the properties.

47.    To keep initial costs low, Defendants purchase countless properties from Wayne County tax foreclosures, as well as other avenues, at rock bottom prices. While the properties are believed to be purchased mostly sight-unseen, Defendants are aware—based on the price, location, and previous experience with real estate in the area—that these homes are dilapidated, and largely uninhabitable.

48.    The 2008 Recession granted Defendants an opportunity to buy houses at rock bottom prices – $10,000 or even less. Defendants seized this opportunity and, today, it is believed that the land contract scheme is around 85-90% of their business. (Ex. 2, Land contracts Trip up Would-be Homeowners. *The Detroit News*. February 29, 2016, p. 2).

49.    The houses are in terrible condition and contain latent defects. Defendants make few, if any, repairs before selling them. The following problems, among others, are common: (a) fundamental components such as water heaters, furnaces, electrical wiring, plumbing fixtures, and gas lines are often missing or badly damaged; (b) basements flood and roofs leak; (c) windows and doors are missing or broken; (d) exterior and interior walls have holes; (e) there are rodent, cockroach, and/or termite infestations; (f) floors have holes and are damaged by animal feces and urine; and (g) there is extensive mold because of the leaks.  (See, for example, Ex. 2; Ex. 3, Natalie James and Jerome Day quotes for repairs, and inspector sheet).

13

50.     Many of the most serious problems are latent defects and cannot be discerned by prospective purchasers. Water issues involving the roof are generally hidden, unless it is a rainy day when few people are looking at houses. Electrical, water, and gas issues may not be immediately discernable because utilities are usually turned off.

51.     Defendants, on the other hand, are fully aware of the poor condition of their houses. After acquisition by Defendants, many of the houses are vacant for an extended time and often deteriorate even further due to vandalism and theft. Defendants also receive many complaints about the condition of the houses from consumers.  Defendants are aware of these complaints when they go to resell the house to a new victim after the previous consumer vacates the property.

52.     Defendants do not disclose what they paid for the house and do not provide an independent appraisal to purchasers. As with inspections, Defendants know that their customers are unlikely to obtain an appraisal on their own because they lack the necessary experience and financial resources. Defendants count on customers not knowing the true condition or value of their houses before they sign a contract.

### _Step 2: Market the Properties as For Sale Via Land Contract_

53.     Based on the condition and location of the houses, Defendants know that appreciation alone is unlikely to provide a profit, so they must either sell the

14

properties or rent them out. If they rent out the properties they can receive a steady stream of cash month after month and utilize summary proceedings to evict a non-paying tenant. However, Defendants know that few—if any—renters will agree to pay the monthly rent Defendants seek where the properties are dilapidated and where the renter will be responsible for all the upkeep, as well as taxes and utilities. There is no upside for the tenant in such a transaction.

54. Further, as Defendants are no doubt aware, Michigan law prevents a landlord from collecting a security deposit that is greater than 1.5x the monthly rent. This limits Defendants' ability to get as much cash up front as possible.

55. So, Defendants had to conceive of a way to convince a consumer that paying a monthly payment, as well as taking on all the expenses and risk of living in a home, is a worthwhile investment. Defendants turned to land contracts. By marketing the transaction as purchasing a home on land contract, Defendants could take advantage of a low-income person's desire to both (1) have stable housing, and (2) finally own their own home. Defendants know that a person is more willing to invest their time and hard-earned money when she believes that it will be her property in the end.

56. Further, under a land contract, Defendants could collect an amount greater than 1.5x the monthly payment and call it a "non-refundable down payment."

57.     However, removal of a vendee through summary proceedings (when forfeiture is permitted by the contract) takes more time (providing for a 90- or 180-day redemption or vacate deadline) and is costlier than summary proceedings against a tenant (which provides for a 10-day redemption or vacate period from the date of judgment). Defendants wanted to take advantage of these features.

58.     To lure in customers, Defendants advertised the properties, both online and in print ads, as properties for sale. (Ex. 4).

59.     When the potential purchaser came in to inquire, Defendants would tell them that very few documents were needed to qualify—State ID, a social security card, and maybe some pay stubs. Sometimes Defendants may require bank statements and tax documents. Yet, at the same time, Defendants tell potential buyers that a "summer special" is available to get a home on land contract with only the State ID, a social security card and some pay stubs. Regardless, it does not appear that Defendants meaningfully analyze the data.

60.     All along, Defendants insist that the potential purchaser is buying the property and that, if the purchaser falls behind, Defendants will work with him/her.

### Step 3: Have the Purchaser Sign Intentionally Confusing, Ambiguous Documents

61.     Then, when it comes time to sign paperwork, Defendants present these low-income purchasers with numerous documents, run through them quickly, and insist that the purchaser is buying the property.

62.     The documents that Defendants provide are titled "Lease with Option" or "Residential Lease with Option Agreement" and is generally accompanied by a "Real Estate Purchase Agreement" that is signed either prior to the execution of the "lease with option" documents or concurrently therewith.

63.     The "Lease with Option" document, which may have a slightly different title depending on the customer, has terms that are couched in usual landlord/tenant language, referring to the customer as a tenant, stating the lease payments and the term of payment, among other terms. It also provides the terms to exercise the purported option to purchase the property.

64.     In contrast, the title "Real Estate Purchase Agreement," which may have varying titles, in conjunction with other documents that to the consumer as a purchaser and directing them to file Property Transfer Affidavits and Principal Residence Exemption Affidavits, represent that the consumer is purchasing the property.

65.     Together, the documents are ambiguous and confusing. One purports to make the customer a tenant; the other, a purchaser.

66.     However, the consumers are continuously assured that the crux of the transaction is that they are buying the property, as the consumers intended.

67.     These representations are supported by Defendants' actions after closing.

68.     All the while, consumers receive invoices that purport to breakdown the payments made by the consumer and the amount still owed.

69.     Importantly, these invoices provided a loan number, a maturity date, identify the home as "collateral" and break down payments in terms of "escrow," "principal," and "interest."

70.     What is more, Detroit Property Exchange also sends out IRS form 1098s to consumers. Plaintiffs Carl Austin received for the 2017 tax year. (Ex. 5-A) Andre Mack received an IRS form 1098 for the 2018 tax year. (Ex. 5-B). Eric Ingram, Veronica Sherrell, and Natalie James received 1098s for the 2017 and 2018 tax years. (Exs. 5-C, D, E, respectively). These 1098s had been sent to the Plaintiffs through the U.S. mail.

71.     Further, based upon a document entitled "Residential Lease with Option Agreement" that is substantially similar the documents signed by other Plaintiffs, Plaintiff Ingram received legal title to his property.

72.     The quit claim deed was signed by Michael Kelly on March 7, 2016, the same date Mr. Ingram closed on the property, but was not recorded until January of 2018. (Ex. 6).

73.     Yet, Defendants still assert that Plaintiffs are tenants rather than land contract vendees or mortgagors.

74.     Thus, although the Defendants make numerous representations that Plaintiffs and the Class are purchasing the property; when it suits Defendants' interests, they file pleadings with the 36th District Court of Michigan, representing to the Court that the consumer is a tenant.

*Step 4: After the Purchaser Falls Behind, Defendants Utilize the Ambiguous Language of the Contract to Evict the Purchaser as a Tenant Rather than a Land Contract Vendee*

75.     This is the bait and switch. Defendants tell a purchaser that he is buying the property and insist that Defendants will work with him if he falls behind on the payments. Then, while continuing to make these representations, Defendants have the purchaser sign paperwork that purports to make the purchaser both a tenant and a purchaser at the same time. Defendants then take advantage of the ambiguous documentation and provisions that purport to make the purchaser a tenant when the purchaser—almost inevitably—falls behind on the payments.

76.     However, until the Defendants are ready to remove the Plaintiffs and Class members, Defendants present every indication that Plaintiffs are purchasing the property. They do this because they know that the crux of the transaction is that the customer is buying the property and that, in exchange for monthly payments, the customers expect to receive title at the end of the term.

77.     For example, in the case of Natalie James and Jerome Day, DPE sent an invoice that provided the month's payment (broken down into interest and

19

principal), as well as referring to a loan number (HD3469Thr-RC), the collateral (i.e., the property address), and the maturity date (11/15/23). (See, Ex. 7, Natalie James and Jerome Day Invoices).

78. These documents were sent even *after* Natalie James and Jerome Day were behind on submitting payments.

79. Natalie James and Jerome Day also received a receipt dated January 10, 2019 that provides the same information as the invoices: a loan number, a reference to the home as collateral, and break down of their payments in terms of interest, principal, and escrow. (Ex. 8).

59. Natalie James and Jerome Day had previously received a document entitled "Land Contract Addendum" that was based on no more than the documents they had signed previously—the "Real Estate Purchase Agreement" and the "Lease with Option." (See, Ex. 9, Natalie James and Jerome Day Land Contract Addendum).

60. Defendants provided Plaintiff Carl Austin with almost identical invoices.

61. Plaintiff Austin received an invoice from DPE that was printed on 02/09/18 and was due on March 1, 2018 for $1,867. (See, Ex. 10, Carl Austin DPE Invoice).

62.     The invoice listed a "loan number: SH8115Str-RC" and it listed the "Collateral" for the loan as "8115 Strathmoor (NO. . .)", with a maturity date of "03/01/24."

63.     In addition, the invoice shows that each monthly payment is a combination of principal, interest, tax/insurance escrow, and late/service fees. For principal, the invoice stated "Principal (Balance 19,419.99)" and listed a "YTD (net)" of 186.61. For interest, it stated "Interest (10.000%)" with a "YTD (net) of $163.39. It listed: "Tax/Insurance escrow" with a "YTD (net) of $150.00."

64.     The invoice refers to "PITI" which commonly stands for "Principal, Interest, Taxes, and Insurance" within the real estate finance context.

65.     Plaintiff Veronica Sherrell has also consistently received invoices and receipts that provide the same information: loan number, collateral, interest, principal, and escrow. She even received her most recent receipt on February 1, 2019, providing the same information: loan number, collateral, interest, principal, and escrow. (Ex. 11).

66.     She also received and signed substantially similar documents to those signed by the other Plaintiffs.

67.     Based upon those documents, she was presented with a document titled "Addendum to Lease with Option to Purchase" (Ex. 12) which stated in part:

> [B]uyer understands, acknowledges, and agrees that he/she is in a
> binding contract to pay the above-mentioned property in full. A deed

21

will be issued and recorded in the buyers name as the new owner so that the buyer can benefit from a program in which she can only qualify if she is on the deed and title of this home.

Buyer understands, acknowledges, and agrees that, in the event the buyer fails to pay the buyers portion of this agreement in full by the time allotted in the contract, the seller may at their discretion reposes [sic] the property and file a Quit Claim Deed removing the buyer from title and reposesing [sic] this property.

68.     The document is signed "Michael Kelly" on behalf of Greater Detroit, LLC, though the notarization section states "was acknowledged before me on Tuesday December 27, 2016 by Veronica LaJean Sherrell & Christian Segura, agent for Greater Detroit LLC. "

69.     Plaintiff Veronica Sherrell then received a deed from Greater Detroit, LLC conveying legal title of the property to her. The deed is signed by Michael Kelly on behalf of Greater Detroit, LLC. (Ex. 13).

70.     These representations are consistent with Defendant Kelly's own statements to Natalie and Jerome. During a meeting, Defendant Kelly insisted that Natalie and Jerome do own the 3469 Three Mile Dr. He said that each payment was for principal and interest, just like in a mortgage payment, and that they "exercised" their right to purchase the same day when they signed the documents. He further told Natalie and Jerome that these documents were enough to show that they were the owners of the property because Michigan recognizes equitable title under such contracts.

22

71.    Defendant Kelly's statement is consistent with the intent of the documents that Plaintiffs and Class members sign and is consistent with the representations that are made to them orally and within various documents they are sent. Yet, Defendants *still* assert that Plaintiffs and the Class are tenants, rather than as vendees under a land contract, and attempt to evict them as such when Defendants feel it is in their interest to do so.

72.    In sum, and as set forth in more detail below and throughout this Complaint, although the documents signed by the Plaintiffs and the Class do not contain the words "land contract," the substance of the written agreements and the course of conduct of the parties, especially the conduct Defendants, demonstrates that it is a purchase money financing transaction: i.e., a land contract. Defendants treat the Plaintiffs and the Class as purchasers and provide the Plaintiffs with documentation to support that conclusion, in addition to continually insisting that the Plaintiffs and Class members are purchasing the properties. Plaintiffs and the Class believe they are purchasing their respective properties, and the crux of these transactions is that the Plaintiffs and Class are looking to purchase, and the Defendants are representing that they are selling.

73.    Until Defendants attempt to evict the Plaintiffs or the Class members, they are told they are purchasers, not renters. But, once Defendants feel that the

purchasers have fallen too far behind, Defendants suddenly evict the purchasers as tenants.

74.    Perhaps the most insidious part of the scheme is that Defendants knew—based on income and previous experience—that most purchasers would fall behind on the payments. Based on information and belief, Defendants do not conduct a good faith, reasonable evaluation of the purchaser's ability to pay the monthly payments on the land contract, nor do Defendants take into account the costs of repairs, utilities, taxes, and other costs associated with home ownership.

75.    This is further demonstrated by the fact that the documents signed by Plaintiffs all bear the same interest rate—10%—and where the "HRA" is consistently $150 to $250 and appears to change for the purpose of  matching the total payment that Defendants want to receive from Plaintiffs and the Class rather than being based upon an actual calculation or estimate of tax or insurance costs.

76.    The scheme has resulted in defaults and delinquencies within a relatively short time after consummating the transaction and it has also historically resulted in high levels of delinquencies and defaults. This is evidenced by the fact that DPE has a ratio of 1.49 "evictions" for each property in its portfolio. (Ex. 14, Ackers, J & Seymour, E., *Instrumental Exploitation: Predatory Property Relations at City's End*, Elsevier Ltd, Feb 20, 2018)(hereinafter "the Study"). There is no sign of abatement and DPE, Greater Detroit, LLC, Montlieu LC, Homes of Detroit, Suena

Homes, and American Tax Refund LLC are only a handful of the entities owned and controlled by Defendant Mike Kelly.

77.     This high level of delinquency and default demonstrates that Defendants know that the demographic and clients they target and consummate transactions with cannot afford the abusive, predatory terms they have placed in these contracts.

78.     But Defendants do not care because the constant turnover allows them to increase profits. While it is true that the constant default and turnover means Defendants will accrue some costs related to "evicting" the purchasers, they will more than make up for these costs by convincing another purchaser to pay a "non-refundable down payment" and collecting payments from that purchaser on the same terms. Therefore, this constant cycle of purchase and removal allows Defendants to keep the properties and maintain a continuous stream of cash flow.

### III.  Data Establishes the High Default Rate of Defendants' Scheme

79.     Predatory land contracts in Detroit have increasingly threatened the housing landscape in Detroit, and its surrounding areas. The Study, *supra*, found that "In areas where people have limited access to credit and low incomes, the land contract is a common instrument to finance home sales. For buyers, the land contract represents an opportunity to own their homes. For unscrupulous agents, it is an opportunity to profit through exploitation and eviction. The speculative use of land

contracts generates a cycle of dispossession as contracts fail and another buyer is found only for the subsequent buyer to fail again."  (Ex. 14).

80.     The Study further found that, "Our sample of the recorded contracts filed with Wayne County Register of Deeds found down payments that exceed the owner's original purchase price, high interest rates, escalator clauses, and requirements that disputes be handled through arbitration rather than the courts."  *Id.* at 131.

81.     The Study concluded, "*This research provides direct evidence of the link between foreclosure buyers, land contracts, and evictions. Id*. at 137. [Emphasis added].

82.     In Table 6, the Study shows that Defendant DPE was one of the largest known contract sellers and that *Detroit Property Exchange initiated more eviction orders than properties it owned with a ratio of 1.49 cases for each property in DPE's portfolio*.

83.     The Study explained, "We linked records of landlord-tenant actions to properties in contract sellers' portfolios if the date those actions were initiated later than the date contract sellers purchased those properties.  In the results shown in Table 6, we found that the 7430 properties acquired by known contract sellers in recent years, 2273 of them linked to at least one subsequent landlord-tenant action. There are 4428 total subsequent landlord-tenant actions recorded for those properties, affecting 7122 named defendants. *Detroit Property Exchange initiated*

26

more orders than properties, thus the ratio of 1.49 cases for each property in their inventory." *Id*. at 137. [Emphasis added].

84. The Study states, "*Though the relationship between land contracts and evictions for Detroit Property Exchange is the most extreme with 1.49 evictions per property, the predatory activity of this company and its many shells has persisted unabated in the city for decades*." "Kelly and his company generally purchase properties out of tax foreclosure and market to buyers on Facebook, door-to-door, and word of mouth." *Id*. at 137. [Emphasis added].

85. The Study also found that Defendant Michael Kelly is among the top property speculators in Detroit. *Id*. at 134.

## IV. Defendants' Predatory Activity Is Well-Known

86. Much has been written over the years about Defendants' predatory scheme in Detroit. In 2016, *The Detroit News* reported that Defendant DPE buys and sells about 600 tax foreclosed homes in Detroit each year and 99.9% are financed with land contracts. (Ex. 2).

87. *The Detroit News* also reported that, "'Land contracts don't cause as many problems there [referring to Oakland and Macomb counties] as ones in Detroit, which often involve ramshackle homes purchased from tax foreclosure auctions and contracts that are written to fail,' contended Joon Sung, deputy chief counsel of

27

Michigan Legal Aid and Defender Association, a nonprofit that represents the needy in court."

84.    In 2014, *The Detroit News* reported that: "The largest private property owner, a Grosse Pointe Woods resident named Michael G. Kelly, had used tax auctions to build a portfolio of more than 1,152 parcels on which nearly $100,000 in blight fines were owed going back six years, the investigation found." (Ex. 15, <u>Bill in Michigan House Targets Property Speculators</u>. *The Detroit News*. Dec. 4, 2014).

## V.  Plaintiffs' Transactions with Defendants
### *Plaintiff Carl Austin*

85.     Plaintiff Carl Austin ("Plaintiff Austin") purchased a house from Defendants, which is located at 8115 Strathmoor, in Detroit, Michigan, 48228.

86.    Plaintiff Austin has a relatively low income and resides in Detroit, making it difficult for him to obtain conventional financing to purchase a home; thus, he turned to Defendants for this opportunity for home ownership.

87.    A friend told Plaintiff Austin about Defendants and the opportunity to buy a home on a land contract.  Plaintiff Austin saw signs in which Defendants advertised that they were selling "homes on land contract." Plaintiff Austin also saw multiple signs at Defendants' office that promoted the land contract homes stating, "homes, 500 down, come inside, land contract."

88.    In Summer 2016, Plaintiff met with Defendant Crystian Segura.

89.     Defendant Segura is a real estate agent and property manager for Dream Realty Company.

90.     Upon information and belief, Defendant Kelly owns Dream Realty Company.

91.     Upon information and belief, Defendant Kelly owns DPE.

92.     Upon information and belief, Defendant Segura also works for and is an agent for DPE and Defendant Kelly.

93.     Defendant Segura told Plaintiff Austin that Defendants were running a "summer special" with less paperwork. To complete the sale, Plaintiff Austin would need to provide only his Social Security Card, pay stubs, and blank money order in the amount of $500.00.

94.     Alternatively, Defendant Segura explained there was the "regular program" which required bank statements, Identification Card, social security card, pay stubs, and tax forms.

95.     Plaintiff Austin opted for the summer special and stated he wanted to purchase a home.  Defendant Segura said, "once you make the payments, you end up owning the home."  Defendant Segura never said that Plaintiff Austin would ever be a renter and subject to tenant eviction proceedings if he defaulted on the loan on the purchase of the property.

96.     Defendants provided Plaintiff Austin with listings via email and would provide him with updated listings as additional properties became available.  When he was interested in a house, Plaintiff Austin asked for the key to see the inside.  Plaintiff Austin had to give a $10 deposit in exchange for the key to view the house.  After he returned the key, he would receive his deposit back.

97.     Plaintiff Austin later discovered that Defendants pretend that different keys open different houses, but, in reality, one key is used for all the houses.

98.     In or around July 2016, Plaintiff Austin looked at the house located at 8115 Strathmoor in Detroit, Michigan.  Plaintiff Austin believed the house was satisfactory and the neighbors in the neighborhood seemed friendly.  While Plaintiff Austin recognized that some repairs were necessary, they seemed relatively minor and cosmetic in nature.

99.     On July 22, 2016, Plaintiff Austin met with Defendant Segura to discuss the terms of the financing and to review documents provided by Defendant Segura.  The documents consisted of a real estate packet that included (a) Real Estate Purchase Agreement; (b) Lead-Paint and Lead-Based Paint Hazards Disclosure of Information for Residential Sales; (c) Seller's Disclosure Statement; (d) Property & Tax information; (e) Loan Amortization Calculator; and (f) Loan Amortization Schedule.  (Ex. 16, Closing Packet on July 22, 2016).

100.   Much of the nomenclature used in the Purchase Agreement is that of a purchase money mortgage financed by the seller.  The consumer is listed as the "Purchaser(s)."  A Parcel ID Number is listed.  There appears to be three different options for the prospective transaction: "LEASE WITH OPTION," "CASH SALE," and "CASH SALE WITH NEW MORTGAGE."

101.   The "LEASE WITH OPTION" under the Purchase Agreement contains filled in blanks for "option consideration," "balance," "monthly installments…for principle (sic.) and interest," "fixed interest rate (per annum)," "for the (HRA) or property taxes" and an "administration fee."

102.   Under section (H) of the General Conditions, the Purchase Agreement form states: "H) Closing:  Subjects to all conditions herein, closing shall take place on or before TBD.  Purchase (sic.) shall be considered lessee, in as AS-IS lease, for the first four months and must complete the conditions in order to execute a Land Contract.  (see Ex.__, draft contract).  Upon completion, four monthly payments will be applied to the purchase price, option consideration shall be applied to purchase price principle (sic.) balance upon execution of Land Contract.  Land Contract will be fully executed when the Lease to Land Contract Authorization form is signed by both parties."

103.   For Lease with Option transactions, Defendants have two other key form documents called "Option to Purchase Agreement" and "Residential Lease

31

with Option Agreement."  Both the Option to Purchase Agreement and Residential Lease with Option Agreement are designed and intended to be executed concurrently with the Purchase Agreement.

104.   The Option to Purchase Agreement sets forth, among other things, the option amount, the option deposit, the term of the option agreement (*i.e.*, the length of monthly payments required), and numerous default and forfeiture terms for the option, including but not limited to, the tenant complying with "ALL terms of the rental agreement."

105.   The Residential Lease with Option Agreement contains standard lease terms which purport to treat consumer as a mere tenant.  Numerous pro-landlord terms are imposed on the Purchaser (defined as "TENANT" in the Residential Lease with Option Agreement).   Among such terms are the tenant's waiver of the landlord's duty to maintain property in a habitable condition, the tenant's assumption of all burdens of repairing the premises and keeping the premises in reasonable repair and fit for habitability.  Moreover, the Residential Lease with Option Agreement purports to transfer the possession of the premises "AS IS" and without representations regarding the condition of the premises.  In addition, the Residential Lease with Option Agreement purports to provide the landlord with a quick remedy, including the summary proceeding eviction of the purchaser as a tenant rather than a summary proceeding for forfeiture of land contract, when the purchaser defaults.

Also, the tenant/purchaser is expected to pay the property taxes and homeowner's insurance for the property.

106.   In addition to the above-described documents presented to consumers, Defendants provide a "Seller's Disclosure Statement" that indicates across its face that "**Seller Never Lived In Property**." The Seller's Disclosure Statement is designed and meant to be executed concurrently with the Purchase Agreement, the Option to Purchase Agreement, and the Residential Lease with Option Agreement as part of a closing packet to alert the purchaser of any known defects.

107.   Defendant Segura went through the paperwork quickly, providing superficial, misleading explanations of the terms, crossing out some provisions as he discussed them.

108.   Defendant Segura told Plaintiff Austin that once he had made all of the payments, he would become the owner of the property. Defendant Segura never told Plaintiff Austin that he would be treated like a tenant and evicted from the property with little notice and no opportunity to redeem if he fell behind on his payments.

109.   All the while, Defendant Segura assured Plaintiff Austin that Defendants would "work with him" if he fell behind on his payments.

110.   Based on these representations, Plaintiff Austin signed the Real Estate Purchase Agreement and the other documents contained in the closing packet.

111.   Defendant never permitted Plaintiff to seek the assistance of counsel or to seek out assistance from an independent pre-loan counseling agency.

112.   Neither Defendant Segura nor any other Defendant provided Plaintiff with any disclosures prior to July 22, 2016.

113.   On July 29, 2016—after signing the purchase agreement—Plaintiff was asked to sign further after-the-fact documents to purchase the property.  Plaintiff did not understand why the additional documents were needed, but he was told he needed them to complete the sale.  These included: (a) Lease Agreement Addendum; (b) Residential Lease with Option Agreement; (c) Application Fee; (d) Tenant Responsibilities to the Property; (e) Acknowledgement of Wayne County Property Tax Bill; (f) Acknowledgment of Water Bill Responsibility; and (g) Option to Purchase. (Ex. 17, Documents signed on July 29, 2016).

114.   What is more, when Plaintiff Austin arrived on July 29 to sign the additional documents, Defendant Segura claimed there had been a counter-offer for $30,000 and tried to get Plaintiff to agree to pay $27,000 instead of $22,900. Plaintiff Austin reminded Defendant Segura that they had a deal. Plaintiff Austin threatened to walk away. Mr. Segura suddenly changed his tune and agreed to consummate the transaction.

115. Plaintiff Austin signed the documents. All the while, both on July 22, 2017 and July 29, 2016, Defendant Segura assured Plaintiff Austin that they would "work with him" if he fell behind on his payments.

116. Plaintiff Austin's transaction had all the elements of a land contract under Michigan law, including the fact that Plaintiff's Real Estate Purchase Agreement is between Plaintiff and Defendants Mike Kelly and DPE, and that the buyer and seller agreed that the Plaintiff was purchasing property but would not receive the legal title until the debt had been satisfied. Under a typical Michigan land contract, purchasers also immediately obtain equitable title while legal title remains with the seller. See, http://miforeclosureresponse.org/wp-content/uploads/2012/09/Land-Contract-Guide-FINAL.pdf.

117. Further, after signing the Purchase Agreement, Plaintiff Austin received monthly invoices indicating that he was purchasing the home at 8115 Strathmoor. (See also, Ex. 10).

118. The interest rate on the loan to purchase the house was 10% on the principal amount of $22,200.00 and thus the transaction falls within a "high-cost mortgage" within the meaning of 12 C.F.R. § 1026.32(a)(1) because Plaintiff Austin's interest rate was 6.84 points above the average prime offer rate, which was 3.16% at the time. (Ex. 18, Average Prime Offer Rate Table, https://www.ffiec.gov/ratespread/aportables.htm).

119.   Defendants did not disclose the annual percentage rate of the transaction, only the interest rate.

120.   Defendants deceived Plaintiff Austin regarding the nature of the transaction, the documents he signed, and the condition of the house.  Plaintiff Austin did not understand that Defendants would treat him as a mere renter.  To the contrary, he reasonably believed he was purchasing a home.

121.   Defendant Mike Kelly signed the Lead Paint Disclosure form and Seller's Disclosure form as the "seller" to close the loan; he did so in his personal capacity without any designation as representative for any entity.

122.   When Plaintiff Austin selected the 8115 Strathmoor house, Defendants did not do a meaningful assessment of his ability to afford the property.  Based on information and belief, Defendants did not conduct a meaningful analysis of Plaintiff Austin's income, credit scores and histories, or debt to income ratios.  Further, based on information and belief, Defendants did not consider whether Plaintiff Austin could afford the many significant repairs that Defendants knew the house would need. Moreover, based on information and belief, Defendants did not meaningfully consider Plaintiff's income to debt ratios.

123.   Plaintiff Austin's closing packet did not include, among other things:

- HOEPA's disclosure statement for a high-cost mortgage; or,

- Written certification that Plaintiff has obtained counseling on the advisability of the transaction from an appropriate counselor,

- An appraisal of the property.

124. After Plaintiff Austin closed on the property, he discovered that the house was dilapidated. The basement flooded and destroyed the hot water tank and furnace. The basement had mold, and Plaintiff Austin had to rip out all drywall and install detectors for mold, carbon monoxide and other toxic fumes. To make matters worse, on a separate occasion, a portion of the roof the size of a 42-inch television caved in and leaked water into the house during a storm.

125. Eventually, Plaintiff fell behind on his loan payments. Instead of using forfeiture procedures, Defendants instituted three separate tenant summary proceedings to evict Plaintiff Austin from the property as a tenant, the most recent of which had a hearing date of April 20, 2018.

126. For his final hearing, Plaintiff Austin obtained counsel from Michigan Legal Services who raised the proper defense that treating the Plaintiff as a tenant in summary proceedings was inappropriate. Defendants agreed that land contract forfeiture was the proper proceeding in response to the default in payments.

127. Ultimately, Plaintiff vacated the property but lost thousands of dollars of equity in the 8115 Strathmoor property.

128.   As of November 1, 2018, Dream Realty USA—another entity believed to be owned and/or controlled by Defendant Michael Kelly, listed Mr. Austin's home, 8115 Strathmoor for $32,900; a $10,000 increase that approximates that amount of cash Mr. Austin believes he invested in the property. It is unknown whether Defendants have made any repairs to the property. Ex. 19, Dream Realty USA Sale Advertisement

*Plaintiffs Natalie James and Jerome Day*

129.   In or around early 2016, Plaintiffs Natalie James and Jerome Day ("Natalie and Jerome" collectively) heard about Detroit Property Exchange, Detroit Houses, LLC and other Michael Kelly controlled entities offering to sell homes on land contract.

130.   Natalie and Jerome set up an appointment and met with Crystian Segura and other persons at 51 Hancock, Detroit, MI, and inquired about touring some homes.

131.   The office at 51 Hancock had numerous signs advertising the sale of homes on land contract terms, and Natalie and Jerome had seen other advertisements. (See, Ex. 20, Handyman Special Advertisement).

132.   Natalie and Jerome were provided a box of keys and were told they could tour any homes they wanted.

133.   They eventually toured 3469 Three Mile Dr, Detroit, MI, 48224.

38

134.   When they toured the home, they did not notice any obvious defects with the roof or other structural issues. There were no strange smells and the home did not have obvious signs of water damage. Most of the issues they noticed appeared minor in nature. However, the home was not perfect. The home was missing two doors from the back and side of the house, respectively, and the boiler and radiators were missing.

135.   Natalie and Jerome indicated that they were interested in purchasing the home, but they were concerned about the cost of replacing the boiler.

136.   Crystian Segura and his assistant, Chrystal, told Natalie and Jerome that the company would fix those issues and that the company would help them out with other repairs after they agreed to purchase the home.

137.   They met with Crystian Segura on or about May 10, 2016 to discuss the terms of purchase. Mr. Segura presented them with a number of documents, including a lease agreement and purchase agreement. He briefly went through the documents and had Natalie and Jerome sign. All the while, he promised that the company would help repair the property and that the company would "work with them" if they fell behind on their payments.

138.   The "Residential Lease with Option Agreement" and the "Purchase Agreement" are substantially similar to the documents signed by Plaintiff Carl

Austin. (See, Ex. 21, Natalie James and Jerome Day Purchase Agreement and Lease Agreements).

139.   Natalie and Jerome also signed an "Option to Purchase Agreement." This has terms substantially similar to the Real Estate Purchase Agreement.

140.   The "Residential Lease with Option Agreement", the "Residential Purchase Agreement", and the "Option to Purchase Agreement" were all executed together at the same closing.

141.   Natalie and Jerome placed a $1,000 deposit on the property and were to pay $550 per month, $400 toward Principal and interest and $150 toward escrow for taxes.

142.   Natalie James and Jerome Day entered into their agreement to purchase the property on May 10, 2016 and are purchasing the property for $25,900 at 10% interest for a term of 93 months (7.75 years). The transaction is a "high cost mortgage" under 12 C.F.R. § 1026.32(a)(1) because the interest rate, which is the lowest possible floor for an annual percentage rate (APR) calculation, was 6.73 points higher than the average prime offer rate, which was 3.27. (Ex. 18).

143.   Defendants did not provide Natalie and Jerome with disclosures prior to May 10, 2016.

144.   After Natalie and Jerome moved into the property, they learned that a previous tenant or owner had poured concrete into the pipes. (See Ex. 22, DPE

acknowledging that Natalie James has reported that cement had been poured into the pipes).

145.   Defendant Segura represented that the company would repair the issue.

146.   No one ever came to repair any issues with the home.

147.   Natalie and Jerome have since obtained quotes from two contractors for the repair of the pipes and for the installation of a boiler. The cost of repairs would cost no less than $47,000. This is at least $21,800 more than Natalie and Jerome agreed to pay for the property. (Exs. 3, 21).

148.   Natalie and Jerome continued to press DPE and Segura to honor their commitments. However, Defendant Segura was almost always in a "meeting" and whenever Natalie and Jerome would attempt to schedule an appointment, they would never receive a confirmation that the appointment was set.

149.   Eventually, Natalie went to the Detroit Building and Safety Department to get a city inspection of the home.

150.   A city inspector came out and inspected the home, finding 29 separate violations and provided 23 corrections orders, including but not limited to replacing the boiler and radiators, replacing the defective roof, replacing missing and defective gutters, replacing the ceiling within the home, replacing leaky waste pipes in bathroom, properly installing new electrical wiring and systems, and repairing basement walls to prevent leaks, among other violations. (See, Ex. 3).

41

151. All the while, Natalie and Jerome were paying $550 each month for ownership of the property.

152. As recently as March 15, 2018, DPE's billing statements listed Natalie and Jerome's payments in terms of "principal" and "interest", had allocated a loan number to Natalie and Jerome's account—HD3469Thr-RC—and provided a maturity date of November 15, 2023. (See, Ex. 7, Natalie James and Jerome Day Invoices).

153. Further, on March 6, 2018, Mr. Segura, on behalf of Home of Detroit LLC and as the apparent agent for DPE entered into a "LAND CONTRACT ADDENDUM" with Natalie and Jerome that amended the "the original land contract signed and dated 06 day [sic] March 2018" concerning the property and authorizing the reduction of monthly payments from $550 to $450. (See, Ex. 9, Natalie James and Jerome Day Land Contract Addendum).

154. Defendants' oral representations, their billing statements, their agreements, and the documents they provided to Natalie and Jerome demonstrate that Defendants consistently give every indication to Natalie and Jerome, as well as other members of the Class, that they were purchasing the home.

155. Yet, on July 23, 2018, Homes of Detroit LLC filed an action for summary proceedings in the 36th District (Case no. 18356808) for non-payment of

42

rent, attempting to evict Natalie and Jerome as tenants rather than vendees in a land contract. (See, Ex. 23, Natalie James and Jerome Day 36th District Docket Sheet).

156.  The suit was ultimately dismissed without prejudice.

157.  Natalie and Jerome are still waiting for repairs to occur. After constantly attempting to contact Defendant Segura, they finally obtained a response. Mr. Segura informed them that Natalie and Jerome have three options: (1) sell the property, (2) accept a deed from Detroit Homes LLC in order to get a non-profit to pay for repairs, but Natalie and Jerome must also execute a deed back to Detroit Homes LLC, or (3) make the repairs themselves.

158.  Based on the facts contained within the Complaint, Natalie James and Jerome Day's transaction constitutes a residential mortgage transaction.

159.  They did not receive the disclosures required by the TILA or the HOEPA.

### *Plaintiff Veronica Sherrell*

160.  Just like the other Plaintiffs, Veronica Sherrell executed three documents: a Real Estate Purchase Agreement, an Option to Purchase Agreement, and a Residential Lease Agreement on or about September 1, 2016. (Ex. 24)

161.  These documents are substantially similar to the other documents signed by the other Plaintiffs.

43

162.  Just like the other Plaintiffs, the "Option to Purchase" agreement and the residential lease agreement purport to run concurrently, for the same term, and for the same overall monthly payment, among other similarities.

163.  At the closing, Ms. Sherrell received an amortization table showing the interest, principal paid over the life of the loan.

164.  Just like the other Plaintiffs, Veronica Sherrell received invoices and receipts that provide a loan number, list her residence as collateral, and allocate her monthly payments in terms of principal, interest, and escrow.

165.  Based upon these documents, Defendant Greater Detroit LLC and Ms. Sherrell signed a document entitled "Addendum to Lease with Option to Purchase" in which Greater Detroit, LLC indicated it would provide Ms. Sherrell with legal title to the Property.

166.  Ms. Sherrell received legal title to the property on December 27, 2016.

167.  At the closing, Ms. Sherrell received a pre-filled out Property Transfer Affidavit which states that the transfer occurred on 12/27/2016 and that the "type of Transfer" is "X Land contract." (Ex. 25).

168.  Furthermore, she received a 2017 IRS form 1098 from Detroit Property Exchange indicating that she had paid "2006.06" in "mortgage interest" in 2017 with a "outstanding mortgage principal as of 1/1/2017" of "$21,320.36". It further states

44

that her "mortgage origination date" was "09/02/16"; this is very next day after she signed her "Option to Purchase Agreement"

169.   Yet, thereafter, Defendants filed legal proceedings against Ms. Sherrell to evict her as a tenant *even though she held legal title to the property* at least two times in May and September of 2018 without first ensuring that it had title to the property in question She did not have counsel for most of those proceedings.

170.   Eventually, Defendant Greater Detroit, LLC realized that Ms. Sherrell held title to the property.

171.   Greater Homes, LLC subsequently filed a quit claim deed purporting to convey title to the 15660 property from Ms. Veronica Sherrell to Greater Detroit, LLC. This document purports to have been signed by Ms. Sherrell on December 27, 2016—the same date on which Michael Kelly conveyed title to her on behalf of Greater Detroit, LLC. (Ex. 26).

172.   The document purports to be signed by Ms. Sherrell in the presence of Ms. Shandra Dicks; however, Ms. Sherrell does not recall signing the quitclaim deed.

173.   Defendant Greater Detroit, LLC then initiated a summary proceeding (forfeiture) proceeding wherein Defendant Greater Detroit, LLC stated that a land contract had been executed on September 1, 2016. (Ex. 27).

174.   As such, Greater Detroit LLC acknowledged within its own pleading that its agreement with Ms. Sherrell was a land contract and that she was a vendee.

175.   The forfeiture proceeding was later dismissed without prejudice on January 22, 2019. (Ex. 28).

176.   Further, as of January 16, 2019, a payment history provided by Detroit Property Exchange shows that her "original bal[ance]" was $22,200 with a "maturity" of 11/02/22. It also represents that over the life of the transaction thus far, Ms. Sherrell has paid a total of $15,062.50: $4,247.63 in interest and $6,267.37 in principal, with a balance of $15,932.63 remaining on the property. (Ex. 29).

177.   It also states that her loan number is GD15660Ea-RC, that the Collateral is "15660 Eastwood (Lease/Option)" and that she made a payment of $325 with $57.77 allocated to interest and $267.23 allocated to principal.

178.   In or around February of 2019, Ms. Sherrell also received an IRS tax form 1098 for the tax year 2018 indicating that she had paid $1446.21 in mortgage interest, had an outstanding principal of $18,486.42 with a mortgage origination date of September 2, 2016.

179.   Based on these facts, and other facts, Ms. Sherrell's transaction constitutes a residential mortgage transaction.

180.   Further, her transaction is a high cost mortgage because the annual percentage rate is more than 6.50% points higher than the APOR.

181.   The APR was never disclosed to her, she did not receive an appraisal, and her documents did not contain appropriate language or disclosures as required by 15 USC 1639(a).

182.   Ms. Sherrell did not receive these or any other disclosures as required by the TILA or HOEPA.

### *Plaintiff Andre Mack*

183.   Plaintiff Mack signed a "Option to Purchase Agreement", a Real Estate Purchase Agreement,  and a "Residential Lease Agreement" on or about August 31, 2018. (Ex. 30).

184.   These documents are substantially similar to the documents executed by Natalie James, Veronica Sherrell, and Carl Austin: that is, the general terms were similar, the residential lease, and "option to purchase" documents had the same term and required the same monthly payment total.

185.   The "Option to Purchase Agreement" stated that the price of the home was $45,900.00. The monthly payment would be $800, which included a Home Reserve account payment in the amount of $250 per month. The interest rate is stated to be 10%. The term is stated to be 132 months.

186.   A few days before, on or about August 28, 2018, Andre Mack received seller disclosures signed by Defendant Michael Kelly.

187.   On or about August 31, 2018, Andre Mack signed a Property Transfer Affidavit, believed to have been filled out beforehand by Luis Machado, an agent, employee, and/or representative of Defendants. (Ex. 31).

188.   The Property Transfer Affidavit has a box checked indicating that the transaction was a sale via land contract for $45,900.

189.   On or about August 31, 2018, Andre Mack also finished filling out and signed a Principal Residence Exemption (PRE) Affidavit. (Ex. 32).

190.   The form was partially filled out before it was presented to Andre Mack for finalization and signature. Based on information and belief, it was filled out by Luis Machado or another employee, agent, or representative of Defendants.

191.   Both the Property Transfer Affidavit and the Principal Residence Exemption Affidavit were submitted to their respective offices on September 4, 2018.

192.   Further, on or about August 31, 2018, as part of his closing on the 16261 Sorrento property, Andre Mack paid a down payment of $1,000 for the property, a $300 water escrow, and a $495 transaction fee. This is evidenced by a document signed by Andre Mack and Luis Machado. (Ex. 33).

193.   On or about August 31, 2018, Luis Machado provided Andre Mack with a document that is titled "SUMMARY PAGE [:] CONGRATULATIONS ON YOUR NEW PROPERTY FROM AMERICAN TAX REFUND LLC" (Ex. 34).

194. The document further states, "Congratulations on your recent purchase, you are now the OWNER of 16261 SORRENTO!" The document then summarizes the total monthly payment due and provides a reminder to fill out and file a Property Transfer Affidavit and a Property Residence Exemption Affidavit.

195. On or about August 31, 2018 Luis Machado also provided Andre Mack with a document entitled "**<u>PURCHASERS CLOSING STATEMENT</u>**" on Detroit Property Exchange letterhead. It provides the sales price and lists the "AMOUNT DUE BY BUYER AT CLOSING" as $1,795.00, which Andre Mack paid. (Ex. 35).

196. Notwithstanding this documentation, Defendant American Tax Refund LLC filed an eviction proceeding against Andre Mack in the 36th District Court in December of 2018, attaching *only* the document titled "Residential Lease Agreement, (Ex. 36).

197. Based on the above facts, American Tax Refund should never have filed an eviction proceeding against Andre Mack.

198. Mr. Mack was not represented by counsel and agreed to pay the amount in arrears as of that date. He paid the amount in arrears, and still has possession and the right to reside in the home.

199. Based on the above, and other facts, Mr. Mack's transaction constitutes a residential mortgage transaction for purposes of TILA.

200.   Further, Mr. Mack's transaction constitutes a higher-priced mortgage because the interest rate he has been charged is more than 1.50 percent higher than the APOR.

201.   Andre Mack did not receive and has never received the disclosures required by the TILA.

202.   Mr. Mack never received an appraisal of his property before or during the execution of his residential transaction documents.

*Plaintiff Eric Ingram*

203.   Plaintiff Eric Ingram purchased his home located at 4417 Courville, on March 7, 2016. On that date, he signed documents substantially similar to the other Plaintiffs: a "Residential Lease with Option Agreement" and an "Option Agreement." (Ex. 37).

204.   Michael Kelly, on behalf of Montlieu LC, signed a quitclaim deed to Plaintiff Eric Ingram dated March 7, 2016; the deed was recorded at the register of deeds office on January 24, 2018. (Ex. 6).

205.   Yet, Defendants had Plaintiff Eric Ingram also sign a document entitled "Land Contract Agreement" in December of 2016, which also referred to itself in paragraph 2 as an "Option to Purchase Agreement" and then later again as a "Land Contract." (Ex. 38)

206.   Plaintiff Eric Ingram also signed a Property Transfer Affidavit on December 14, 2016, which was pre-filled by Detroit Property Exchange staff. (Ex. 39).

207.   The Agreement called for total payment each month of $600 for a term of 110 months with an earnest money deposit of $1,500 and a balance of $25,200 to be paid over the term.

208.   The "concurrent lease" also called for a total payment of $600 per month.

209.   $250 of each monthly payment was to be allocated to an "HRA" each month, which is purportedly in place to pay taxes.

210.   However, Defendants informed Mr. Ingram orally at some point that he had to pay $625 per month so that $275 could got into the HRA.

211.   Mr. Ingram complied and has paid $625 per month.

212.   There are no delinquent taxes on his property as of February 2019.

213.   Further, Mr. Ingram obtained a Poverty Exemption, meaning that he will only pay a nominal "tax" each year for water/sewage so long as the exemption continues.

214.   Mr. Ingram had previously been told by Ms. Shandra Dicks that if he paid off the delinquent taxes and obtained the poverty exemption, DPE would stop

allocating his payment to the HRA and he would only have to pay the principal and interest payment of $350.

215.   In light of this, Mr. Ingram requested that Defendant Detroit Property Exchange stop allocating funds to the HRA.

216.   DPE refused, stating that the contract required him to pay the HRA regardless.

217.   As such, it is apparent that the HRA is little more than a hidden finance charge.

218.   This appears consistent with DPE's known practice of not using money within the HRA to pay taxes automatically on behalf of the purchaser; rather, it purported to "require" the purchaser to ask them to pay the taxes.

219.   Furthermore, this is supported by the fact that the HRA amount appears disconnected from the actual taxes owed or to be accrued each year and is simply part of a "total monthly payment" calculation.

220.   For example, Mr. Ingram and Mr. Mack have substantially different incomes and different monthly payments--$800 for Mr. Mack and $600 for Mr. Ingram. Yet, DPE allocates $250 for each payment to the HRA.

221.   Further, Natalie James and Jerome Day purchased their home for a purchase price of $25,900 while Mr. Ingram is purchasing his home for a purchase

price of $27,900; yet, Natalie James and Jerome Day pay $550 per month with only $150 allocated to the HRA while Mr. Ingram pays $250.

222.   Mr. Austin sought to purchase his home for a purchase price of $22,900. His total payment was $600 per month, yet only $150 was allocated to the HRA.

223.   Plaintiff Eric Ingram received an IRS 1098 form for tax years 2017 and 2018.

224.   In reliance on Defendants' representations that Mr. Ingram is purchasing his home, Mr. Ingram has signed affidavits and contracts that require ownership of the property.

225.   Plaintiff Eric Ingram's transaction is a residential mortgage transaction that is subject to the TILA and HOEPA.

226.   Plaintiff Eric Ingram's transaction is a high cost mortgage because his Annual Percentage Rate is greater than 6.50% above the APOR for March 7, 2016.

## CLASS ACTION ALLEGATIONS

227.   Plaintiffs and the Class bring this Complaint as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3).

228.   Plaintiffs and the Class request that this Court certify a Class with potentially two sub-classes as follows.

229.   Plaintiffs and the Class request that this Court certify a Class of all persons who entered into a "residential mortgage transaction", as that term is used and defined in 15 U.S.C. § 1602(x) and 12 C.F.R. §1026.32(a)(1), with any Defendant, and any entity in which Defendant Michael Kelly or any other Defendant has an ownership or controlling interest, and who has engaged in any "lease with option" or "land contract" or any other variant of a residential mortgage transaction in a manner similar to the scheme alleged in this Complaint  on or after November 19, 2015.

230.   Plaintiffs and the Class may also request that this Court certify a Subclass of all persons who have entered into a residential mortgage transaction with any of the Defendants on or after November 12, 2015 where such residential mortgage transaction constitutes a "high-cost mortgage" transaction as defined by 15 U.S.C. § 1602(bb).

231.   Plaintiffs and the Class may also request that this Court certify a Subclass of all persons who have entered into a residential mortgage transaction with any of the Defendants on or after November 19, 2017.

232.   This action is properly maintained as a class action because:

a)      Joinder of all Class members is impracticable because of the size of the Class.  Plaintiffs understand that the total number of persons within the Class and sub-class exceed 50 persons.

54

b)    Defendants have acted or refused to act on grounds generally applicable to the Class.

c)    The claims alleged on behalf of the Class raise questions of law and fact that are common to the Class and predominate over questions affecting only individual members because all Class members entered into substantially similar written contracts with Defendants pursuant to Defendants continuous scheme.  Common questions of law and fact include, among others:  (i) whether the transactions at issue are residential mortgage transactions within the meaning of TILA and HOEPA, (ii) whether the land contract scheme as implemented by Defendants is unfair and predatory; (iii) whether Defendants are required to—but do not—make a reasonable and good faith determination that consumers have a reasonable ability to afford the transaction; (iv) whether Defendants are required to—but do not—provide the disclosures required by 15 U.S.C. § 1639(a), and whether they do so sufficiently in advance of when the contract is executed; (v) whether Defendants are required to but do not exclude consumers who have not had pre-loan counseling; (vi) whether Defendants are required to but do not provide appraisals to the Plaintiffs and the Class, among other common issues of fact and law.

d)      The claims of the class representatives are typical of the Class because the class representatives entered into residential mortgage transactions with Defendants that are comparable and/or have substantially similar material terms as those believed to have been signed by Class Members, and they did so pursuant to the same scheme perpetrated by Defendants in an attempt evade federal law and perpetrate a fraud or wrong upon the Plaintiffs and Class Members.

e)      A class action is superior to the other available methods for fairly and efficiently adjudicating this litigation.

233.   The Plaintiff class representatives and counsel will fairly and adequately represent the interests of the class.  The Plaintiffs have no interests that are antagonistic to the interests of the other class members and class counsel have extensive experience in civil rights, consumer, and class action litigation.

## INJURY TO NAMED INDIVIDUAL PLAINTIFFS

234.   Plaintiffs reallege all preceding paragraphs as if set forth herein.

235.   Plaintiffs have been injured by Defendants' scheme and failure to provide the disclosures required by the TILA and HOEPA.

236.   25 U.S.C. § 1640(a) provides that any creditor who fails to comply with any requirement imposed under [Title 15, Chapter 41, Subchapter I, Part B] with

respect to any person shall be to such person [or class] in an amount equal to the sum of:

- Actual damages sustained as a result of the failure;

- [In a class action], such an amount as the Court may allow of up to the lesser of (a) $1 million or (b) 1% of Defendants' net worth for each failure to comply by the same creditor;

- The costs of the action together with a reasonable attorneys' fee as determined by the Court; and

- In the case of a failure to comply with any requirement under section 1639, 1639b(c) or 1639c(a), an amount equal to the sum of all finance charges and fees paid by the consumer, unless the creditor demonstrates that the failure to comply is not material

237.   For violations of 15 U.S.C. §1639b, Defendant Segura and the entity defendants who have also acted as mortgage loan originators are liable to the Plaintiffs and any Class Members for the greater of actual damages or an amount equal to three times the total amount of direct and indirect compensation or gain accruing to the mortgage originator in connection with the residential mortgage loan involved in the violation, plus costs and a reasonable attorneys' fee.

238.   Defendant Kelly is liable for Defendant Segura's actions because Defendant Segura acted as Defendant Kelly's agent, and Defendant Segura acted

pursuant to Defendant Kelly's direction, supervision, and within the scope of his agency and employment.

239.   Defendant Kelly, as set forth in more detail below, is also liable for the actions and failures of his entities because they are mere instrumentalities and alter egos that he uses to accomplish his scheme and to avoid his obligations under federal law.

240.   As a direct, foreseeable, and proximate result of Defendants' actions, Plaintiffs have suffered, and in the future will continue to suffer, damages related to defending continuous, frivolous filings of landlord/tenant suits and the loss of income and other expenses associated therewith, the monthly payments (including principal and interest) which they have paid to Defendants upon the reasonable belief and based on Defendants' affirmative representations that Plaintiffs and the Class are purchasing their homes,  humiliation, embarrassment, and mental and emotional distress.

241.   In causing injury to Plaintiffs and the Class, Defendants have acted intentionally, maliciously, and with willful, callous, wanton, and reckless disregard for the rights of the Plaintiffs and the Class.

## CAUSES OF ACTION

### Count I

**Violation of the HOEPA (Mandatory Disclosures),
15 U.S.C. § 1639(a), 12 C.F.R. § 1026.32(c)**

**(As to DPE, Suena Homes, and Homes of Detroit, LLC, Greater Detroit, LLC, American Tax Refund, LLC, Montlieu LC)**

242.   Plaintiffs reallege and incorporate all prior allegations as if set forth fully herein.

243.   Defendants are engaged in the practice of using high-cost mortgages that fall within the meaning of 12 C.F.R. § 1026.32(a)(1) of the HOEPA to sell their homes. These high-cost mortgages involve any consumer credit transaction that is secured by the consumer's principal dwelling in which there is a first mortgage and the Annual Percentage Rate ("APR") is more than 6.50 percentage points higher than the average prime offer rate.

244.   Defendants Suena Homes, Homes of Detroit, LLC, DPE, Detroit Homes, LLC, and American Tax Refund, LLC, and   are "creditors" within the meaning of 12 C.F.R. § 1026.2(a)(17).

245.   Defendants have extended the high-cost mortgages at issue without providing a disclosure stating: "You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application.  If you obtain this loan, the lender will have a mortgage on your home. You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan."

246.   Further, Defendants failed to provide other disclosures required by Title 15, Chapter 41, Subchapter I, such as an appraisal, for example.  This violates 15 U.S.C. § 1639(a) and 12 C.F.R. § 1026.32(c).

## Count II
### Violation of the TILA and HOEPA (Ability to Repay),
### 15 U.S.C. § 1639c(a), 15 U.S.C. § 1639(h), 12 C.F.R. § 1026.43(c)
### (As to DPE, Suena Homes, and Homes of Detroit, LLC, Greater Detroit, LLC, and American Tax Refund, LLC, Montlieu LC)

247.   The transactions at issue are "high-cost covered transactions" within the meaning of 12 C.F.R. § 1026.43(b)(4).  This section applies to any consumer credit transaction that is secured by a dwelling, including any real property attached to a dwelling.  The transaction also involves a dwelling as defined in § 1026.2(a)(19), which means a residential structure that contains one to four units, whether or not that structure is attached to real property. The term includes an individual condominium unit, cooperative unit, mobile home, and trailer, if it is used as a residence.

248.   Defendants Suena Homes, Homes of Detroit LLC, and DPE are "creditors" as defined in 12 C.F.R. § 1026.2(a) (17)(i) which means "A person who regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than four installments (not including a down payment), and to whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is no note or contract."  Here, the transactions

at issue constitute written agreements that extend credit for the purchase of a residence.

249.   Defendants have initiated the covered transactions at issue without making a reasonable and good faith determination at or before consummation that the consumer will have a reasonable ability to repay the loan according to its terms.

250.   Based on information and belief, consumers default on the loans that are made based on the written agreements to purchase a home.

251.   Based on information and belief, the creditors' underwriting standards—to the extent any such standards exist—have historically resulted in comparatively high levels of delinquency and default.

252.   As a result, Defendants Suena Homes, Homes of Detroit, LLC, and DPE are in violation of 15 U.S.C. § 1639c(a) and 12 C.F.R. § 1026.43(c).

**Count III**
**Violation of the HOEPA (Pre-Loan Counseling),**
**15 U.S.C. § 1639(u), 12 C.F.R. § 1026.34(a)(5)**
**(as to DPE, Suena Homes, and Homes of Detroit, LLC, Greater Detroit, LLC**
**and American Tax Refund, LLC, Montlieu LC)**

253.   The transactions at issue are "high-cost mortgages" within the meaning of 12 C.F.R. § 1026.32(a)(1). These high-cost mortgages involve any consumer credit transaction that is secured by the consumer's principal dwelling in which there is a first mortgage and the Annual Percentage Rate ("APR") is more

than 6.50 percentage points higher than the average prime offer rate, which is an estimate of the rate people with good credit typically pay for a similar first mortgage.

254.   Defendants Suena Homes, Homes of Detroit, LLC, and DPE are "creditors" within the meaning of 12 C.F.R. § 1026.2(a)(17) (i) which means "A person who regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than four installments (not including a down payment), and to whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is no note or contract."

255.   Here, the Real Estate Agreements constitute written agreements that extend credit for the purchase of a residence.

256.   Defendants have extended the high-cost mortgages at issue without receiving written certification that the consumer has obtained counseling on the advisability of the transaction from an appropriate counselor, in violation of 15 U.S.C. § 1639(u) and 12 C.F.R. § 1026.34(a)(5).

## Count IV
### Violation of the TILA (Loan Origination), 15 U.S.C. § 1639b
### (as to Defendant Crystian Segura)

257.   Congress enacted 15 U.S.C. § 1639b to "assure that consumers are offered and receive residential mortgage loans on terms that reasonably reflect their ability to repay the loans and that are understandable and not unfair, deceptive or abusive."

258.   The transactions at issue are "residential mortgage transactions" as defined by 15 U.S.C. § 1602(x), which "term "residential mortgage transaction" means a transaction in which a mortgage, deed of trust, purchase money security interest arising under an installment sales contract, or equivalent consensual security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling."  A land contract is a residential mortgage transaction under this section.

259.   Defendant Crystian Segura is a "person" as defined by 15 U.S.C. § 1602(e).

260.   Defendant Crystian Segura, is a "mortgage originator" as defined by 15 U.S.C. § 1602(dd)(2).  The term "mortgage originator"-- (A) means any person who, for direct or indirect compensation or gain, or in the expectation of direct or indirect compensation or gain--  (i) takes a residential mortgage loan application; (ii) assists a consumer in obtaining or applying to obtain a residential mortgage loan; or (iii) offers or negotiates terms of a residential mortgage loan; (B) includes any person who represents to the public, through advertising or other means of communicating or providing information (including the use of business cards, stationery, brochures, signs, rate lists, or other promotional items), that such person can or will provide any of the services or perform any of the activities described in subparagraph (A).

261.   Defendant Segura takes the residential loan application and documents, negotiates the terms, and assists the consumer in executing the documents.

262.   Based on information and belief, Defendant Segura does not make a reasonable, good faith determination of a consumer's ability to repay the land contract pursuant to its terms.

263.   The terms of these land contracts, which constitute "high cost mortgages," have abusive and predatory characteristics and have high interest rates.

264.   Defendant Segura regularly and habitually engages in the business of originating residential mortgage transactions as part of a commercial enterprise.

265.   Based on information and belief, consumers default on the loans' terms within a short time after consummation.

266.   Based on information and belief, the underwriting standards used by Michael Kelly, Crystian Segura, and Michael Kelly's entities—DPE, Suena Homes, and Homes of Detroit, LLC, to the extent they have underwriting standards at all— have historically resulted in comparatively high levels of delinquency and default.

267.   Based on information and belief, Crystian Segura is not a licensed mortgage originator in accordance with Michigan or Federal Law.

268.   Based on information and belief, Crystian Segura by and through his entities has never included any unique identifier provided by the Nationwide Mortgage System and Registry.

64

269.   By engaging in the above activities, including, without limitation, originating loans without a license that contain abusive, predatory terms, and without making a good faith, reasonable determination that Plaintiffs and class members had the reasonable ability to repay the loans, Crystian Segura has damaged Plaintiffs and the Class and violated 15 U.S.C. §1639b.

## Count V

### Violation of TILA (Loan Origination), 15 U.S.C. § 1639b
### (as to DPE, Homes of Detroit, LLC, and Suena Homes, Greater Detroit, LLC, and American Tax Refund, LLC, Montlieu LC)

270.   Suena Homes, Homes of Detroit, LLC, and Detroit Property Exchange, among others, advertise that the properties can be purchased by consumers through seller-financing, specifically through the utilization of land contracts.

271.   When consumers select a property to purchase, they work with Defendant Segura, an agent for Suena Homes, Homes of Detroit, LLC, and Detroit Property Exchange, to discuss terms and sign seller-financing documents as part of residential mortgage transactions.

272.   Based on knowledge and belief, consumers are offered seller financing, and they are only shown homes that are owned by Michael Kelly or an entity he owns or controls.

273.   Based on knowledge and belief, Suena Homes, Homes of Detroit, LLC, Greater Detroit, LLC, Montlieu LC, American Tax Refund, LLC, and DPE do not offer to bring consumers together with non-Michael-Kelly-related third parties.

274.   Based on knowledge and belief, Michael Kelly operates his entities with the purpose and intent of having these entities originate seller-financed residential mortgage transactions with Plaintiffs and other consumers located in Detroit, MI.

275.   The terms of these residential mortgage transactions are deceptive, have high interest rates, and contain predatory characteristics.

276.   Based on information and belief, neither Michael Kelly, DPE, Homes of Detroit, LLC, and Suena Homes, nor any of their agents, utilize underwriting standards that would provide a good faith, reasonable determination that a purchaser can afford the residential mortgage transaction.

277.   Based on information and belief, Mr. Kelly, by and through DPE, Suena Homes, and Homes of Detroit, LLC, repetitively and habitually engages in residential mortgage transactions as a commercial enterprise.

278.   As a result of this activity, Michael Kelly, by and through his owned entities, has reaped millions of dollars of revenues and profits from Plaintiffs and other consumers.

66

279.   DPE, Suena Homes, and Homes of Detroit, LLC engaged in the same conduct with Plaintiffs and other similarly situated.

280.   Based on information and belief, Crystian Segura is an agent of multiple entities owned and controlled by Defendant Michael Kelly.

281.   Based on information and belief, Crystian Segura is an agent of Michael Kelly and the entities Michael Kelly controls, including but not limited to DPE, Suena Homes, and Homes of Detroit, LLC.

282.   Based on information and belief, DPE, Homes of Detroit, LLC, and Suena Homes, by and through Michael Kelly's direction, utilized Defendant Segura on a day-to-day basis to meet with potential victims, discuss land contract terms, and originate seller financed purchases of Michael Kelly's dilapidated properties.

283.   Based on information and belief, consumers default on the loan's terms in a short time after consummation.

284.   Based on information and belief, the underwriting standards used by DPE, Suena Homes, and Homes of Detroit, LLC—to the extent they have underwriting standards at all—have historically resulted in comparatively high levels of delinquency and default.

## Count VI

## VIOLATION OF HOEPA, 15 U.S.C. 1639(k)

285.   15 U.S.C. 1639(k) provides that a creditor may not impose a late fee in excess of 4 percent of the amount of the payment past due.

286.   Payment histories and the contracts signed by Plaintiffs and the Class state that DPE (on behalf of other Defendants) will charge a flat $75 late fee.

287.   DPE has charged this $75 late fee against each Plaintiff.

288.   This $75 late fee is greater than 4% of the monthly payment for each Plaintiff.

289.   As such, it is a fee that is explicitly prohibited by 15 U.S.C. 1639(k) and is in violation thereof.

## COUNT VII

## Violation of 15 U.S.C. 1639(r) and 12 CFR § 1026.34(b)

290.   15 U.S.C. 1639(r) and 12 CFR § 1026.34(b) state that a creditor shall "not structure a transaction that is otherwise a high-cost mortgage in a form, for the purpose, and with the intent to evade the requirements of a high-cost mortgage subject to this subpart, including by dividing any loan transaction into separate parts."

291.   Here, Defendants together and in concert with one another, as part of a unified scheme, by and through oral and written representations and through use of

the U.S. mail, have intentionally structured what is in substance a residential mortgage transaction and a high cost mortgage into what purport to be a separate lease and an option to purchase and a real estate purchase agreement in a surreptitious attempt to evade TILA and HOEPA.

## COUNT VIII

**Fraud
&
Piercing the Corporate Veil
(based upon Fraud and/or other wrong)
(to Impose liability upon Michael Kelly for his actions and the actions of
Suena Homes, Homes of Detroit, LLC, DPE, American Tax Refund, LLC,
Greater Detroit, LLC, Montlieu LC, and to hold each entity responsible for
the actions of the other)**

292.   Plaintiffs reallege and incorporate all prior allegations as if set forth fully herein.

293.   Based on information and belief, Michael Kelly is the owner, operator, and managing member or officer of Suena Homes, Homes of Detroit, LLC, DPE, Greater Detroit LLC, Homes of Detroit, LLC, American Tax Refund LLC, Montlieu LC, among other entities.

294.   Based on information and belief, Michael Kelly has created and exercised control over these entities with the intent to perpetrate a fraud or wrong upon Plaintiffs and the Class.

69

295.   Michael Kelly created, structured, organized, and utilized these entities for the purpose of impermissibly evading the TILA and HOEPA and to perpetrate what he, the entities, and Mr. Segura, intended to be a fraudulent scheme upon Plaintiffs and the Class.

296.   The Defendant Entities, and other to be uncovered, are Mr. Kelly's alter egos and instrumentalities to achieve his scheme: his intent and action is their intent and action.

297.   Michael Kelly and his entities, by and through each other and their representatives and agents, represented to Plaintiffs and the Class that they are homeowners who are purchasing properties on land contracts or through other similar means even though Defendants never intended to treat them as property owners, intended for the documents to not constitute land contracts/ purchase money transactions, and intended to file improper landlord tenant proceedings notwithstanding the continuous, consistent representations that Plaintiffs and the Class had engaged in purchase-sale transaction and that they were, implicitly, property owners.

298.   In fact, during a meeting with Plaintiffs Natalie James and Jerome Day, Defendant Kelly insisted that they own the property they are purchasing.

299.   Mr. Kelly said that each payment was for principal and interest, just like in a mortgage payment, and that they exercised their right to purchase the same

day when they signed the documents and that they advertised land contracts and "leases with option" the same way.

300.   Mr. Kelly further told Natalie and Jerome that these documents were enough to show that they were the owners of the property because Michigan recognizes equitable title under such contracts.

301.   Plaintiff Ingram received a deed to his property; Ms. Sherrell received a deed to her property. All Plaintiffs received receipts, invoices, payment histories or the like that represented they were purchasing the property by representing that each payment was for interest, principal, escrow, providing a loan number, maturity date, and other similar information.

302.   If Plaintiffs and the Class are not land contract vendees or the mortgagor of an equitable mortgage, or otherwise a purchaser holding equitable title for their respective properties, then Defendants representations were false.

303.   When the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth as a positive assertion; the defendant made the representation with the intention that the plaintiff would act upon it; the plaintiff acted in reliance upon it.

304.   Defendants representations were material, made with intent to deceive and mislead the Plaintiffs and Class members, and made with the intent that Plaintiffs and the Class would rely on such representations.

305.   Plaintiffs and the Class reasonably relied upon Defendants' oral and documentary representations because the representations were continuous and made during the execution of their documents, after the execution of the documents, and even after Defendants filed any summary proceedings in the 36th District Court, by continuing to represent that payments were for principal and interest, and by sending Plaintiffs and class members IRS form 1098s via the U.S. mail.

306.   The receipt of an IRS 1098 form is a particularly potent representation upon which Plaintiffs and the Class relied in understanding that they were owners of the property because (1) the form compares their transaction to a mortgage and states the origination date and interest that had been paid, (2) it represents to the Plaintiff or Class Member that their transaction is equivalent to a purchase transaction (i.e. a mortgage) under the law, (3) refers to Detroit Property Exchange as their lender, and (4) it bears the imprimatur of being an important, official document because it is provided upon an IRS form.

307.   As a result of the receipt of a 1098, in conjunction with the other representations made by Defendants, Plaintiffs and Class Members are reasonably assured that they are purchasing the property, are implicitly discouraged from seeking to mitigate damages, and further assured that a proceeding in the 36th District Court does not involve their status as a purchaser.

72

308.   Michael Kelly knowingly and intentionally utilizes his agents, representatives, and co-defendant sham entities to perpetrate this fraud and other wrongs upon Plaintiffs and Class Members.

In fact, the sham nature of these entities has even been recognized in academic research. The Study concluded that, "*Though the relationship between land contracts and evictions for Detroit Property Exchange is the most extreme with 1.49 evictions per property, the predatory activity of this company and its many shells has persisted unabated in the city for decades*."

309.   The Study, along with new reports that have been conducted by the media over the years, demonstrates that Michael Kelly, by and through his agent, representatives, and co-defendant sham entities, and other entities yet to be discovered, have acted as an enterprise perpetrating this fraudulent scheme for years (from at least from 2009 to present), causing housing instability within the City of Detroit, financial harm to its residents, and the filing of inappropriate legal proceeding, thereby harming the public at large, as well as the Plaintiffs and the Class, specifically, as alleged in this Complaint.

310.   Further, the Study, among other evidence, demonstrates that Michael Kelly, by and through DPE and other entities, has crafted seller-financing land contract agreements utilizing underwriting standards (if any standards are used at

all) that have historically resulted in comparatively high levels of delinquency and default.

311.   Further, based on information and belief, consumers default on these agreements within a short time after consummation.

312.   Based on information and belief, this behavior has been ongoing for years with no sign of abatement.

313.   The nature and extent of this behavior, spanning years and likely harming residents within the City of Detroit, demonstrates, among other evidence, that Michael Kelly is using Suena Homes, DPE, Homes of Detroit, LLC, Montlieu LC, Greater Detroit, LLC American Tax Refund, LLC and other entities as his instrumentalities to perpetrate a fraudulent, predatory scheme that is in violation of federal law.

314.   As a direct and proximate cause of Defendants' action Plaintiffs and the Class have not received the disclosures to which they are legally entitled, have lost their homes, entered into home repair contacts and agreements in reliance upon their status as a home owner, made repairs to the property, paid utilities, paid city taxes, and otherwise paid thousands of dollars and principal and interest to purchase their homes.

315.   Unless the corporate veil is pierced, Michael Kelly will likely create new entities, or utilize other existing ones he may own, to perpetrate the same

scheme and attempt to evade federal law yet again with new corporate entities that are not encumbered by a money judgment or injunctive relief.

## Count IX

### Aiding and Abetting
### (As to Defendant Michael Kelly)

316.   Plaintiffs reallege and incorporate all prior allegations as if set forth fully herein.

317.   As stated, the Defendants, at relevant times, violated the Truth in Lending Act and the Home Ownership Equity Protection Act, and they also owed various legal obligations to Plaintiffs and the Class under these statutes, as well as at common law.

318.   As a result of the conduct described herein, the Defendants have breached their duties and obligations, serving their own interests above those of Plaintiffs and the Class, violating the Truth in Lending Act and the Home Ownership Equity Protection Act, and other wrongful conduct, in a myriad of ways, including by misrepresenting the status of Plaintiffs and the Class as tenants rather than vendees when proceeding to summary proceedings to remove Plaintiffs and Class members from their respective properties.

319.   The Defendant Michael Kelly perpetrated this, and other, unlawful conduct—or in the alternative knowingly aiding and abetting the Co-Defendants—

as part of a scheme to deprive Plaintiffs and the Class of their rights of home ownership and forfeiture rights under a land contract, while enriching themselves.

320.   Michael Kelly knowingly participated in the wrongful conduct of the Co-Defendants, causing substantial damages to Plaintiffs.

321.   Among other things, Defendant Kelly knowingly, intentionally, and with bad faith and malicious intent aided and abetted the Co-Defendants in the perpetration of violations of the Home Ownership Equity Protection Act, in addition to the frauds, breaches of contracts, misrepresentations, civil conspiracies, unjust enrichments, and other illegal conduct.

322.   All Defendant Kelly's conduct in this regard was carried out with full knowledge that he was participating in and aiding and abetting these various wrongs.

323.   At all relevant times, the Defendant Kelly knew that he was aiding and abetting the Co-Defendants to accomplish these unlawful ends.

324.   For example, and among other things, Defendant Kelly knowingly assisted, aided, encouraged and facilitated the above wrongful conduct of his Co-Defendants in, among other things, signing the Lead-Paint and Lead-Based Hazards Disclosure of Information for Residential Sales form and the Seller Disclosure Form in connection with the closing on the sale of the properties, among other wrongs.

325.   Defendant Kelly was also instrumental in negotiating and facilitating the sale of the properties to Plaintiffs and the Class by his formation of DPE, Homes of Detroit, LLC, and Suena Homes, as agent to carry out the land contract scheme.

326.   Defendant Kelly engaged in this scheme to enrich himself.

327.   Defendant Kelly executed certain sale documents, in his own individual capacity, thereby approving, ratifying, and allowing the violations of Home Ownership Equity Protection Act in connection with the sale of the properties to Plaintiffs.

328.   The result of the Defendant Kelly's aiding and abetting the Co-Defendants, and Defendant Kelly's orchestration thereof, was to completely, and wrongfully, violate the Home Ownership Equity Protection Act and causing Plaintiffs and the Class to incur substantial damages.

329.   Defendant Kelly's conduct is and has at all times been willful, wanton and malicious, and Plaintiffs and the Class are therefore entitled to exemplary damages.

## Count X

## DECLARATORY JUDGMENT
### (As to all Defendants)

330.   Plaintiffs reallege and incorporate all prior allegations as if set forth fully herein.

331.   The transactions described within the Complaint create an actual controversy that places the parties in a position of uncertainty as to their respective rights in real property.

332.   Plaintiffs and the Class seek a declaratory judgment to adequately protect their equitable ownership interest in their homes.

333.   Plaintiffs request that the Court hold that the transactions entered into between the Plaintiffs and certain Defendants are land contracts and/or equitable mortgages and therefore "residential mortgage transactions" within the meaning of 15 U.S.C. § 1602(x) and that those who still have possession of their homes are the equitable owners thereof, or legal owners thereof for those who have legal title, subject to repayment of the purchase price to the appropriate Defendant.

## COUNT XI

## EQUITABLE ESTOPPEL

### (As to all Defendants)

334.   Defendants represented to Plaintiffs and Class Members that they were purchasing a home on a land contract or equivalent security arrangement, were the practical owners of the home, and/or that they were building equity in the home with each payment.

335.   Defendants continuously represented to Plaintiffs and the Class that they were still purchasing the home, even where Plaintiffs and Class Members did not comply strictly with the terms of the written agreements.

336.   Plaintiffs and the Class justifiably relied upon these consistent, continuous representations, which included oral representations, invoices, receipts, IRS form 1098s, referring to Plaintiffs and class members as "purchasers", encouraging and representing that Plaintiffs and the Class could file Property Transfer Affidavits and Principal Residence Exemption Affidavits.

337.   Plaintiff and the Class were prejudiced and harmed by these representations because they took actions in accordance with their belief that they were purchasing the home: they attempted to repair the properties, they took on the responsibility of large delinquent tax and water bills, they agreed to enter into long term, multi-year contracts, they agreed to pay principal and interest.

338.   As a result of the foregoing, Defendants should be estopped from asserting in this proceeding and in any other proceeding that Plaintiffs and the Class were merely renting the properties in question.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class respectfully pray that the Court grant them the following relief:

A.      Certify this case as a class action.

79

B.     Enter a declaratory judgment that the transactions entered into between various Defendants and the Plaintiffs and the Class are residential mortgage transactions within the meaning of 15 U.S.C. § 1602(x).

C.     Enter a declaratory judgment that the foregoing acts, policies, and practices of Defendants violate 15 U.S.C. §§ 1639, 1639b, and 1639c;

D.     Enter a permanent injunction enjoining Defendants and their directors, officers, agents, and employees from continuing to publish, implement, and enforce the illegal conduct described herein and directing Defendants and their directors, officers, agents, and employees to take all affirmative steps necessary to remedy the effects of that conduct and to prevent additional instances of such conduct or similar conduct from occurring in the future;

E.     Award compensatory damages to Plaintiffs and the Class in an amount to be determined by the jury that would fully compensate them for their injuries caused by the conduct of Defendants alleged herein;

F.     Award statutory damages to Plaintiffs and the Class in an amount to be determined by the Court in accordance with 15 U.S.C. § 1640(a)(2)(B), and statutory damages in accordance with 15 U.S.C. § 1640(a)(4);

G.     Award punitive damages to Plaintiffs and the Class in an amount to be determined by the jury that would punish Defendants for the willful, wanton, and reckless conduct alleged herein and that would effectively deter similar conduct in

the future;

      H.     Award Plaintiffs and the Class their reasonable attorneys' fees and costs

pursuant to 15 U.S.C. §§ 1640(a)(3); and

      I.     Order such other relief as this Court deems just and equitable.


                             Respectfully submitted,
                             *Attorneys for Plaintiffs*

March 7, 2019                  /s/*James A. Buster*
                             Theresamarie Mantese (P53275)
                             Kathryn R. Eisenstein (P66371)
                             James A. Buster (P81186)
                             **MANTESE HONIGMAN, P.C.**
                             1361 E. Big Beaver Rd.
                             Troy, Michigan 48083
                             (248) 457-9200
                             gmantese@manteselaw.com
                             tmantese@manteselaw.com
                             jbuster@manteselaw.com

                             Marilyn Mullane (P30998)
                             Joe McGuire (P75571)
                             **MICHIGAN LEGAL SERVICES**
                             2727 Second Avenue, Ste. 333
                             Mailbox #37
                             Detroit, MI 48201
                             (313) 964-4130 ext. 403
                             mmullane@milegalservices.org
                             jmcguire@milegalservices.org

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs rely on their prior request for trial by jury as to all issues so triable, and re-assert that request here.

Respectfully submitted,<br>
*Attorneys for Plaintiffs*

March 7, 2018

/s/*James A. Buster*
Theresamarie Mantese (P53275)
Kathryn R. Eisenstein (P66371)
James A. Buster (P81186)
**MANTESE HONIGMAN, P.C.**
1361 E. Big Beaver Rd.
Troy, Michigan 48083
(248) 457-9200
gmantese@manteselaw.com
tmantese@manteselaw.com
jbuster@manteselaw.com

Marilyn Mullane (P30998)
Joe McGuire (P75571)
**MICHIGAN LEGAL SERVICES**
2727 Second Avenue, Ste. 333
Mailbox #37
Detroit, MI 48201
(313) 964-4130 ext. 403
mmullane@milegalservices.org
jmcguire@milegalservices.org